UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| DARLA YOOS, Baltimore, MD, (Baltimore County); EDWIN MCCALL, Emmaleand, Kentucky; and KERRI LEVINE, St. Louis, MO, on behalf of themselves and others similarly situated,<br><br>              Plaintiffs,<br><br>    v.<br><br>PUBLISHAMERICA LLLP, 230 East Patrick St., Frederick, MD 21701; Serve on Registered Agent: VICTOR E. CRETELLA, III, 230 East Patrick St., Frederick, MD 21701,<br><br>              Defendant. | No.<br><br>PUBLISHAMERICA CLASS ACTION COMPLAINT |

**TABLES OF CONTENTS**

<u>Page(s)</u>

I.     INTRODUCTION ...................................................................................................1

II.    PARTIES, JURISDICTION AND VENUE .......................................................2

III.   STATEMENT OF FACTS ...................................................................................4

     A.   Traditional Book Publishers Make their Money Selling Books, Whereas Vanity
          Presses Charge Authors to Publish their Books.........................................................4

     B.   Defendant PublishAmerica Presents Itself as a Traditional Publisher, but
          It Makes Its Money off of Its Authors ..................................................................6

     C.   Defendant Sells Marketing Promotion Packages for Services that Should Fall
          within Its Contract, that are not Reasonably Designed to Promote Its Authors'
          Books, or are Misrepresented ..............................................................................13

          1.   Defendant requires its own authors to pay for the usual and customary
              marketing that any reputable publisher would do as a matter of course....15

          2.   Defendant offers services that are not reasonably designed to promote
              book sales.................................................................................................19

          3.   Defendant falsely represented the services it offered. ...............................24

          4.   To perpetuate its fraud, defendant scrubs its website of any negative
              comments and attacks the credibility of its detractors ...............................31

     D.   Plaintiffs were Duped by Defendant..................................................................33

          1.   Darla Yoos lost her publication rights and roughly $1,500 for bogus
              services.....................................................................................................33

          2.   Defendant published Edwin McCall's book riddled with errors and then
              refused to correct them unless he paid for it .............................................38

          3.   Defendant took Kerri Levine's publishing rights and charged her
              for bogus services and then failed to deliver .............................................41

IV.   CLASS ACTION ALLEGATIONS ....................................................................46

V.    CLAIMS FOR RELIEF ......................................................................................48

     A. COUNT ONE  THE FEDERAL DECLARATORY JUDGMENT ACT
        (28 U.S.C. § 2201) ............................................................................................48

     B. COUNT TWO  MARYLAND CONSUMER
        PROTECTION ACT (MD. COM. LAW § 13-301) .............................................50

     C. COUNT THREE  UNJUST ENRICHMENT ....................................................51

VI.   PRAYER FOR RELIEF ......................................................................................52

VII.  JURY DEMAND ..................................................................................................52

## I.    INTRODUCTION

1.     Plaintiffs Darla Yoos, Edwin McCall, and Kerri Levine, bring this action on behalf of themselves and a proposed class of others similarly situated, pursuant to the Maryland Consumer Protection Act (CPA), Md. Com. Law § 13-301, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Maryland common law.

2.     Defendant PublishAmerica LLLP is a book publisher that portrays itself as "a traditional, royalty paying publisher."[1]  But unlike traditional publishers, which profit from the sale of books, defendant profits from its own clients, *i.e.*, the authors who submit works for publication by defendant.  Defendant lures these authors in by promising to publish their book at no cost, and it makes false and misleading representations that it will promote their books and support the authors' efforts to sell their own books.  But this is not the case.

3.     Instead, once the authors sign the contract, which gives defendant the rights to their book for seven to ten years,[2] defendant does nothing constructive to promote their books, but instead offers various promotion packages on a fee-for-service basis, *e.g.*, sending the book to a book fair, sending it to the National Library of Scotland for inclusion in their collection, sending it to best-selling author J.K. Rowling for review, and the like.[3]  These services, which are either misrepresented or never carried out, are not reasonably designed to promote class members' books.

4.     For example, PublishAmerica was exposed recently when it falsely claimed that it had presented books to J.K. Rowling for her review, which Rowling denies, and when it claimed

---

[1] PublishAmerica, http://www.publishamerica.com/facts/index.htm.
[2] Until recently defendant's contracts required authors to provide defendant the rights to publish their works for seven years. *See* Attachments 1-3; *Fact No. 10*, PublishAmerica http://www.publishamerica.com/facts/index.htm, ("Our contracts expire after ten years.") (last visited May 21, 2012).  Currently, defendant requires ten years.
[3] *See infra* Section III.C.(3).

to have a contract with a major Canadian bookseller, which the Canadian bookseller likewise denied.[4]

5.     Defendant provides very poor editing services, is slow to respond to book orders, and it routinely overprices the books it publishes. This is no accident. Defendant will only lower the price of its clients' books to a competitive rate for a $399 fee.[5] These practices make it difficult for even the most enterprising authors to promote their own books.

6.     Defendant is not responsive to inquiries from its clients, or worse it is dismissive or belligerent.[6]

7.     Like plaintiffs, thousands of other aspiring authors who signed up with PublishAmerica have become demoralized because the publishing contract appears to be little more than a pretext for selling dubious services, *i.e.*, services that are not reasonably designed to promote the books and in some cases are not even carried out.[7] These authors also feel trapped because PublishAmerica owns the rights to their books for seven to ten years. This presents a Hobson's choice for the authors: either throw good money after bad for suspect promotional services or abandon the book that was a labor of love.

## II.     PARTIES, JURISDICTION AND VENUE

8.     Plaintiff Darla Yoos is a resident of Baltimore, Maryland. Ms. Yoos contracted with defendant to publish her book, *Diary of a Demonologist* in 2012. A copy of the contract is attached as Attachment 1. The contract states that defendant may use its discretion in the promotion of her book. Nothing in the contract indicates that defendant would promote her book only on a fee-for-service basis.

---

[4] *Id.*
[5] *See infra* Section III.C.(1).
[6] *See infra* Section III.D.
[7] *See infra* Section III.C.(3).

9.      Plaintiff Edwin McCall is a resident of Kentucky. Mr. McCall contracted with defendant to publish his book, *Dirty Potatoes and Other Short Stories* (written under the pseudonym Quincy Maxwell) in July 2009. A copy of the contract is attached as Attachment 2. The contract states that defendant may use its discretion in the promotion of his book. Nothing in the contract indicates that defendant would promote his book only on a fee-for-service basis.

10.     Plaintiff Kerri Levine is a resident of St. Louis, Missouri. Ms. Levine contracted with defendant to publish her book, *From Catholic to Atheist: Kicking Back with a Godless Heathen*, on April 30, 2010. A copy of the contract is attached as Attachment 3. The contract states that defendant may use its discretion in the promotion of her book. Nothing in the contract indicates that defendant would promote her book only on a fee-for-service basis.

11.     Defendant PublishAmerica LLLP is a Maryland Limited Liability Limited Partnership with its principal office and place of business located in Frederick, Maryland. Defendant describes itself as "a traditional, royalty paying publisher" that, unlike a vanity press, does not charge fees for publishing a book.

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from defendant, there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

13.     The amount in controversy is supported by the facts. Defendant claims to have 50,000 authors under contract.[8] Defendant has made hundreds of offers for purported services related to the contract, with prices running from approximately $22 to $1,899.[9] It also claims

---

[8] *Facts*, PublishAmerica, www.publishamerica.com/facts/index.htm (last visited June 1, 2012).
[9] *Service List*, PublishAmerica, www.publishamerica.net/service/ (last visited June 1, 2012).

annual revenues of approximately $4-6 million.[10]  On information and belief, the majority, if not

all of defendant's revenues arise from its publishing agreements with its authors.  Plaintiffs and

the proposed class period seek damages for the last three years.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because defendant

resides in the State of Maryland and a substantial part of the events or omissions giving rise to

the claims occurred in or emanated from this District.  Defendant's publishing contracts also

require all disputes arising from the formation or the performance of the contract, including tort

claims, to be submitted to a court in the State of Maryland.[11]

### III.     STATEMENT OF FACTS

**A.     Traditional Book Publishers Make their Money Selling Books, Whereas Vanity
Presses Charge Authors to Publish their Books.**

15.     Publication is easy in the day of the internet, where anyone can post his or her

work online.  But publication by a traditional publisher is rare.  For example, the largest

publishers, Random House, Penguin Group, HarperCollins Publishing, or Simon & Schuster will

not even review a manuscript unless the author is represented by a recognized literary agent.[12]

16.     Traditional publishers operate by selling books.  They acquire the rights to

publish books from authors, employ editors who help authors revise and polish their books and

come up with a marketing plan for the books.  Traditional publishing houses do not take money

---

[10] Paula Span, *Making Books*, Washington Post, (Jan. 23, 2005), http://www.washingtonpost.com/wp-dyn/articles/A25187-2005Jan20.html.
[11] *See* Attachments 1-3.
[12] *See, e.g., List of Publishers Who Do Not Charge*, eHow.com, http://www.ehow.com/info_8093965_list-publishers-do-not-charge.html#ixzz1tvv0zYI6; Katherine Rosman, *The Death of the Slush Pile*, Wall Street Journal, (Jan. 22, 2010), http://online.wsj.com/article/SB10001424052748703414504575001271351446274.html.

from the author; they pay the author an advance prior to publication, then a percentage of the royalties based on how many copies the book sells.[13]

17.     Vanity presses, also known as "subsidized publishing" operate on a different model. These publishers, *e.g.*, Vantage Press, Dorrance Publishing or Ivy House, charge writers to be published, at prices that can run into thousands of dollars.[14]  Newer models like iUniverse and Xlibris use the digital print-on-demand technology and charge less to publish, but also tend to set book prices high to cover the cost of individual printing.[15]  If they are legitimate businesses, these publishers make it clear to the author that they are offering a limited set of services and that the author bears the expense.[16]

18.     Vanity presses may provide a legitimate service, for example, a social organization planning to sell a cookbook or commemorative book, or a family elder passing her memoirs around to the grandchildren.  But self-publishing does not open doors for an aspiring writer, hoping to be picked up by a mainstream publisher one day.  For example, the Authors Guild does not accept self-published authors and most established publishers see prior publication in a vanity press as a drawback, not as a career asset.[17]

19.     As a general rule, bookstores will only stock books from traditional publishers because these books can be returned to the publisher if they do not sell.  Self-published books are typically printed on demand and cannot be returned.  For this reason, self-published authors

---

[13] *Types of Publishing Companies*, eHow.com, http://www.ehow.com/list_6850864_types-publishing-companies.html#ixzz1YhD7uRlx (last visited June 1, 2012).
[14] *See FAQ*, Vantage Press, (estimating that the cost of publishing will range from $5,000 to $25,000), http://www.vantagepress.com/faq#f2 (last visited June 1, 2012).
[15] *See FAQ*, iUniverse, (book prices based on number of pages), http://www.iuniverse.com/faqs/bookproduction.aspx#Question2 (last visited June 1, 2012).  Note that ebooks are set at much lower prices. *See, e.g.*, book prices at http://bookstore.xlibris.com/.
[16] Span.
[17] *Id.*

cannot expect to take part in book readings or book signings at local bookstores unless they make

special arrangements, like buying their own books and selling them by consignment.[18]

**B.    Defendant PublishAmerica Presents Itself as a Traditional Publisher, but It Makes Its Money off of Its Authors.**

20.    Defendant describes itself as a traditional publisher in the sense that it makes its

money selling its authors' books, not selling them services, like a vanity press:

> PublishAmerica adheres to the traditional publishing concept: we assume all financial risks and all expenses, **we earn our income by selling books, and books only.**[19]

> PublishAmerica is **NOT in any way a POD**, vanity press, or subsidy publisher, and has nothing in common with them. None of our authors are being self-published.[20]

21.    It professes to be:

> a traditional, royalty paying publisher. We charge no fees for publishing a book, ever. There's no catch, no hidden surprises. We pay small advances to indicate our principle. The author is never, ever, under any obligation to pull their wallet to make any purchase whatsoever. We don't want their money. We want their book. All expenses involved with acquiring, producing, manufacturing, and publishing a book, and marketing it to the industry's wholesale and distribution channels for full availability through all bookstores at home and abroad are underwritten by PublishAmerica solely.[21]

22.    Defendant represents that it will actively promote its authors' books and assist

them in their own promotions:

> An author's obligations are few, since he/she already contributes the lion's part by having written the book. We are very conscious

---

[18] Eric Erickson, *Marketing & Distribution of Self-Published Books*, Ehow, http://www.ehow.com/info_8333322_marketing-distribution-selfpublished-books.html (last visited June 1, 2012).
[19] *FAQs*, PublishAmerica, http://www.publishamerica.com/facts/index.htm (emphasis in original) (last visited May 24, 2012).
[20] *Facts and Figures, Fact #5*, PublishAmerica, http://www.publishamerica.com/facts/index.htm (emphasis in original) (last visited May 24, 2012).
[21] *Id.* at *Fact #6*.

of that fact. No book was written overnight. It has cost most authors a year or longer to write it, and often many more years to let the creative process well up.

We are also conscious of the fact that seeing your book in print is a life-defining moment. It is something an author never forgets for the rest of their lives. It is something to enjoy and celebrate. Therefore, the obligations should be minimal.

The author has really only one obligation: to provide us with the completed final-version manuscript. We'll take it from there.

Does this mean that the author must sit on his/her hands after signing the contract? Not exactly. We expect the author to actively promote the book whenever and wherever possible.[22]

But separate from its website, president and co-founder of PublishAmerica, Larry Clopper concedes that the company principally relies on its authors to sell their own books.[23]

23.    Others see defendant in a much harsher light. For example, an L. A. Times staff reporter reports that PublishAmerica is considered by many to be "a vanity press in a different dress."[24]

They contend PublishAmerica rejects few, if any, manuscripts, and while it might publish your book, it does no editing for style or context – a key step in the publishing process. They complain that it provides limited (some say no) copy editing, and leaves authors to do their own marketing. Books are distributed "on demand," which means a copy isn't printed until it is ordered. And since PublishAmerica won't take returns, relatively few of their 11,000 titles have made it to store shelves.

---

[22] *Question: What are my obligations as an author?* PublishAmerica, http://web.archive.org/web/20110716040334/http://www.publishamerica.com/benefits.htm#obligations (last visited May 24, 2012). More recently, PA has added the statement: "Once the book is in publication, and booksellers have access to it, author promotion becomes important. PublishAmerica often offers special post-publication promotion opportunities at a fee. Those are optional and at the author's sole discretion, *e.g.* when we attend important trade shows such as Book Expo America or the Frankfurt Book Fair in Germany." *See* https://www.publishamerica.com/faqs.htm#obligations (last visited June 1, 2012).
[23] Span.
[24] Scott Martelle, *Please Publish This Dud,* L. A. Times, (Feb. 5, 2005), http://articles.latimes.com/2005/feb/05/entertainment/et-hoax5.

24.     The article quotes Ann C. Crispin, Chair of the Science Fiction and Fantasy Writers of America's Committee on Writing Scams, who describes Defendant as one of "the biggest and most obnoxious ... author mills of them all – and one of the most successful, I imagine."[25]  In a separate article, Crispin explains:  "They claim to be a traditional publishing house, but they're not.  Commercial publishing houses, as I would call them, pay a reasonable advance – measured in thousands of dollars; they pay royalties based on cover price; and they have contracts with reasonable reversion clauses, they don't take things [*i.e.* publishing rights] for an ironclad seven years."[26]

25.     A recent article in the North Country Gazette summarizes:

You've heard the saying "If it sounds too good to be true, it probably is."

For sure that fits what appears to be one of the biggest scams in the publishing industry, PublishAmerica.

They get the gold mine, you get the shaft.

There are thousands of would-be writers out there, who dream of seeing their book in print whether it's a book of poems, their biography or their first novel.

And PublishAmerica which is based in Frederick, Maryland, capitalizes on that.

They promote themselves as a traditional book publisher, touting the slogan "We treat our authors the old-fashioned way – we pay them."

But not much.

Their website is loaded with testimonials but as one victim aptly summarizes their operation, "PublishAmerica makes money, lots of it, from sales of books to their authors.  Not from sales to the

---

[25] Martelle.
[26] Susan Pagani, *Paperback Writer*, San Antonio Current, (June 24, 2004,) http://www2.sacurrent.com/columns/story.asp?id=58606.

> public. Not from sales to bookstores. Despite the hype and clever
> innuendoes to the contrary, they have no interest in a market
> outside their stable of authors."[27]

The author concludes: "The best thing that a writer can do is avoid PublishAmerica like the

plague."[28]

26.     Washington Post reporter, Paula Span, explains that by misrepresenting itself as a

traditional publisher, PublishAmerica obscures its fatal no return policy and its reliance on its

own authors to market their books. She describes the experience of one aspiring writer who was

lured in by PublishAmerica's false promises:

> Doubts first arose when she began receiving e-mailed exhortations
> offering special, limited-time discounts if she agreed to purchase
> many copies of her own book. Would Avon or Pocketbooks do
> that? she wondered. She grew suspicious, too, when the proofs of
> her novel arrived – riddled, St. Amour says, with spelling,
> punctuation and grammatical errors.
>
> And when she visited her local Waldenbooks to schedule a book-
> signing, an assistant manager checked her computer, "looked at me
> and said, 'That's POD.' "In industry parlance that means "print on
> demand," books that are most likely self-published. "We don't do
> signings for POD authors," the employee said. . . .
>
> St. Amour, who acknowledges being "very ignorant about the
> publishing industry" at the time, believed she was contracting with
> a press that was small but could launch her new career. Yet a
> major chain bookseller – and the nearby Borders concurred – was
> telling her it wouldn't put her book on its shelves.
>
> "The excitement," she says now, "was short-lived."
> PublishAmerica operates differently, she has learned.[29]

27.     Defendant's authors invest a lot of money to promote their own books only to find

that defendant stands in way of any measurable success:

---

[27] *Attention Writers: Avoid PublishAmerica*, N. Country Gazette, (Apr. 19, 2010),
http://www.northcountrygazette.org/2010/04/19/writers_shaft/.
[28] *Id.*
[29] Span at ¶¶ 4-5, 7-8.

Tim Johnson, who lives in Wauchula, Fla., toiled for seven years
over "a supernatural, psychological mystery/thriller." He admits,
after the fact, to naiveté: "I didn't know how a true publishing
company worked. I didn't know anything about agents, or where
to begin to find one." Why would he? Johnson works in a
fertilizer company's shipping department. So when
PublishAmerica accepted his novel, "I thought after all the hard
work I'd put into it, this was the real thing."

He bought 150 copies, printed up promotional posters, persuaded a
local book and gift shop to hold a signing and bought newspaper
ads to lure customers. He spent about $2,000 and recouped about
$700, he estimates, before he realized that, without being able to
penetrate more bookstores, his novel was "not going anywhere, no
matter how hard I work."

If PublishAmerica went under, "I'd be glad, because no one else
could be hurt." [30]

28.     "I couldn't line up any book signings unless I purchased the books in advance

because bookstores refused to carry books that are printed on demand," said another author.[31]

29.     Defendant's former client, Phillip Dolan warns first-time authors: "Don't even go

near PublishAmerica." Mr. Dolan, who spent $7,000 promoting his own book, told the

Washington Post that he prevailed in arbitration of a breach of contract claim against defendant.

While the award is confidential, Mr. Dolan said he received the relief he sought, and the amount

was substantial. Most importantly, he said he was no longer bound by his contract.[32]

30.     In 2004, scores of unsatisfied clients complained to Publishers Weekly "that

PublishAmerica sells books to which it no longer holds the rights; offers authors only a 30%

discount; doesn't pay royalties it owes; engages in slipshod editing and copyediting; sets

unreasonable list prices; and makes little effort (and has had little success) in getting books into

---

[30] *Id.* at 4.
[31] Bridgette Harwood, *PublishAmerica must pay up*, Frederick News-Post, (Mar. 25, 2006),
http://www.fredericknewspost.com/sections/news/display.htm?storyid=47638.
[32] *Id.*

- 10 -

bookstores.  PA has been nonresponsive to complaints, said the authors (most of whom have not

been published by traditional houses) and refuses to release authors from their contracts.  While

PublishAmerica doesn't charge for printing the books, it does require authors to provide a list of

friends and family, and then markets to them heavily, according to the authors."[33]

      31.     These authors claim that defendant is worse than a vanity publisher because it

misrepresents itself.  "If they would just say, buy your books up front and pay X amount and

we'll give you X, Y and Z, then that would be one thing," said author Kate St. Amour.  "But they

don't tell you those things when you sign up with them."  Dee Power explained that she and

other dissatisfied authors were making their complaints public because:  "We hope to spare other

people, perhaps thousands, the frustration and problems we've had with this deceptive

company."[34]

      32.     One writer explained:

> What was PublishAmerica doing to make sure my book was
> reviewed?  Nothing.  I decided to contact local daily and weekly
> newspapers by e-mailing a press release.  The only responses I got
> were two e-mail autoresponders announcing the editors were on
> vacation.

> I spent $40 on copies of my book's galley and mailed them to three
> national newspapers and the Library Journal magazine.  Then I
> phoned a book reviewer at the 'San Diego Union-Tribune' and
> asked if he'd be interested in reviewing my book but before I could
> even describe what it was about, he asked who my publisher was.
> I told him.  "We don't review books by that publisher," he stated.

> I called all the local bookstores and spoke to the managers and/ or
> community relations people about my book, including a couple of
> stores who were physically located on the street I'd written about.
> An independent bookstore owner told me that since PA didn't have

---

[33] Steven Zeitchik, *Authors Allege Publisher Deception*, Publishers Weekly, (Nov. 19, 2004),
http://www.publishersweekly.com/pw/print/20041122/22907-authors-allege-publisher-deception-.html.
[34] *Id.*

> a return policy she was unable to stock my novel. Another said
> that I could sell my book on consignment. The chain stores of
> Borders and Barnes & Noble said my book would be available
> through Ingram if anyone chose to order it.[35]

33.     The PublishAmerica name and logo is a stigma to those in the media, bookstores

and libraries. The books are overpriced and poorly edited and cannot be returned, making them

both undesirable and difficult to order.[36] "Strip away all the self-proclaimed 'traditional'

pretentions and all you are left with is a company who host[s] grossly expensive books online for

sale, and provide[s] print-on-demand orders, it would seem, primarily to sell to their own

authors."[37]

34.     The PublishAmerica Message Board only includes positive messages from

purported testimonials and other postings. By eliminating any negative reviews from its website

and disparaging its critics, defendant perpetuates its deceptive business practices.[38]

35.     One industry review reaches the following conclusion about PublishAmerica:

> A deep read through their website reveals, at best, a company with
> a ridiculously inflated view of what they can do for the many
> thousands of authors who publish with them every year, and at
> worst, PublishAmerica prosecute[s] a deliberately skewed and
> misleading model of 'traditional publishing' I can only equate with
> McDonalds announcing they are going into landscape gardening
> tomorrow. This is a hit and miss – what success is achieved comes
> by default of numbers – attempt to claim you are a large traditional
> publisher by exploiting the obvious and inevitable efforts of the
> more gifted and commercial astute authors who somehow got
> themselves into this unfortunate mess. They are the real foot-
> soldiers and force behind PublishAmerica, out on the road, signing
> books and beating on the closed doors of executive offices,

---

[35] Lisa Maliga, *Publish Anything:  The Saga of a PublishAmerica Author*, ArticleCity, (Nov. 25, 2004), http://www.articlecity.com/articles/writing/article_314.shtml.
[36] *Id.*
[37] Mick Rooney, *PublishAmerica/Independence Books – Reviewed,* Indep. Publ'g Magazine, (Mar. 12, 2010), http://mickrooney.blogspot.com/2010/03/publishamerica-reviewed.html.
[38] *See, e.g.,* Don Davidson., *The Truth About PublishAmerica*, Christianity for Thinkers, http://christianityforthinkers.com/publishamerica.htm (last visited June 1, 2012).

weighed down by some of the most expensively sold books in the
book retail industry.  They are also the same authors worn down,
week after week, by requests from PublishAmerica with discount
deals to buy more of their books in the hope that they can help
PublishAmerica land the book on the desk of a Random House
editor, or better still, Oscar Award winner, Sandra Bullock!

*   *   *   *

While PublishAmerica is not a traditional publisher; they neither
fit the strictest terms of vanity press or author solutions service.
You do not become a traditional publisher by default because you
do not charge an author an upfront fee.  Therein is the self-created
sword PublishAmerica falls upon.  They believe traditional
publishing is defined solely by whether the author pays for their
book to be published or not, and that is fueled by the ignorance and
naivety of authors combined with the greed and ignorance of a
publisher.  Plainly and simply; PublishAmerica [is] just a bad
publisher.[39]

C.    **Defendant Sells Marketing Promotion Packages for Services that Should Fall within
      Its Contract, that are not Reasonably Designed to Promote Its Authors' Books, or
      are Misrepresented.**

      36.    Defendant is in the business of handling its authors' dreams.  People lured into

defendant's scheme against their better instincts: "The immortality of the book, the permanence

of the book draws people in," says Paul Aiken, Executive Director, of the Authors Guild.[40]  Once

they agree to publication with PublishAmerica, defendant has a captive audience to offer services

that are guaranteed to do nothing but enrich defendant's coffers.

      37.    Defendant's contracts state that defendant will promote their books at its

discretion and it expects its authors to make themselves available for local book signings.[41]  This

makes it seem like defendant is a traditional publisher.  But what defendant does not disclose to

its authors is that it relies on its authors to provide the names and contact information for the

---

[39] Rooney.
[40] Span.
[41] *See* Attachments 1-3, ¶ 13.

- 13 -

local media to whom it submits a press release announcing the publication of the book and that the press release will rely primarily on the book blurb that the authors' themselves have written. It does not disclose that it expects its authors to arrange for their own book signing events and that bookstores will be unlikely to allow such events or to stock the authors' books unless, possibly, the authors purchase their books themselves.  It also does not disclose that it will regularly solicit its authors to purchase their own books.

        38.    Defendant also does not tell its authors before they sign with it, that it will solicit them regularly to purchase promotion packages, such as submitting their books for consideration for literary prizes, for Hollywood production or for publication in other languages.  It does not disclose that its sales solicitations are limited principally to the list of family and friends authors provide to defendant and that unless the authors purchase defendant's promotional packages, it will not promote their books to the general public, other than perhaps a perfunctory press announcement, largely drafted by the authors themselves and sent to the local media the authors have identified for the defendant.

        39.    Defendant's promotional fee-for-service packages fall into two principal categories.  On the one hand, they withhold the services that any reputable publisher would do automatically if it was genuinely interested in promoting book sales, unless the authors pay a service fee.  On the other hand, they offer services that are not reasonably designed to promote books at all.  By accepting payment for such useless services, defendant preys upon the inexperience of authors, who rely on defendant's marketing expertise.

- 14 -

1.  **Defendant requires its own authors to pay for the usual and customary marketing that any reputable publisher would do as a matter of course.**

40.   For example, defendant sent the following solicitation to Plaintiff Kerri Levine,

author of the book, *From Catholic to Atheist: Kicking Back with a Godless Heathen*:

Is this email not displaying correctly?
View it in your browser.



*We treat our authors the old-fashioned way — we pay them.*

Dear author:

Your Christian book deserves the best Christian book distributor that the world has: **Spring Arbor**. An Ingram company (Ingram is the world's largest book wholesaler), it is Spring Arbor's mission "to provide superior distribution services for products that enhance people's relationship with God and spread Jesus Christ's message to the world."

Spring Arbor serves virtually all Christian bookstores. We recently met and talked to them at a major marketing event in Atlanta.

## We will submit your book to Spring Arbor

## and ask them to carry it.

Go to www.publishamerica.net/service/SpringArbor.html to be included in our submission, for $49. Your book will be reviewed by our staff so that Spring Arbor only gets to consider the best that we have to offer. Money

- 15 -

010313-11 525581 V1

back: if your book, for whichever reason, does not make the cut of what
we submit to Spring Arbor, you will receive a full refund. You will be kept
informed about our selection and submission process, and also when
Spring Arbor lets us know that they carry your work for their Christian
bookseller distribution.

Spring Arbor's mission statement ends with these words, "It is essential to
our mission to enthusiastically serve our customers and to be gracious
and truthful in all our interactions."

You must choose a shipping option to activate. No use of coupons is
allowed.

Thank you,
--PublishAmerica Bookstore

*DISCLAIMER: PublishAmerica has no affiliation with Spring Arbor beyond
that of a standard publisher-wholesaler/distributor relationship, and makes
no claim to preferential access or other special treatment. No specific
result from PublishAmerica's best efforts to represent and promote its
authors and their books is suggested or guaranteed.*[42]

Defendant requests $49 merely for the author's book to be considered for submission to a

bookstore that is likely to stock works with Christian themes.  Setting aside the merits of

defendant's suggestion (*i.e.*, that a Christian bookstore would want to stock books on atheism), a

traditional publisher would not charge its authors for the "service" of evaluating the market for

each book and seeking to market them to the appropriate channels.  This email is just one of

---

[42] Email provided to plaintiffs' counsel for review.

010313-11  525581 V1

scores of promotions that defendant's authors receive every month, which seek to shift the cost of publication and marketing to the authors.[43]

41.     What is also remarkable about this solicitation is that it charges its authors a "shipping charge" in order to "activate" defendant's review of a book that defendant publishes. This is part of a broad scheme to deceive plaintiffs and class members by charging bogus fees.

42.     In addition to its email solicitations, defendant also markets its publication and promotional services to its authors on its website. For example, it offers to reduce the price of an author's paperback books from $24.95 to $18.95 or to $10.95, but only if the author pays defendant $199[44] or $399 respectively.[45] This is clearly a ruse to collect money from its authors. A traditional publisher interested in marketing its author's works, would price the books competitively for sale. Defendant's $24.95 price tag for paperback books is much higher than the market will bear, especially for works by first time authors, whose works have not been properly vetted or marketed. Defendant also charges its authors $59 if they would like their book to be available in hardback.[46] Recall these books are printed on demand, so it does not involve the production of any books. Add in two "complimentary" copies of the book and the price increases to $89.[47]

---

[43] *See, e.g.*, Davidson, (listing by date many of the promotional offers the author received from defendant and providing PDFs of the promotions).
[44] *List Price Reduction 1*, PublishAmerica, http://www.publishamerica.net/service/ListPriceReduction1.html (last visited June 1, 2012).
[45] *List Price Reduction 2*, PublishAmerica, http://www.publishamerica.net/service/ListPriceReduction2.html (last visited June 1, 2012).
[46] *Hardcover Authors*, PublishAmerica, http://www.publishamerica.net/service/HardStores.html (last visited June 1, 2012).
[47] *New Hardcover*, PublishAmerica, http://www.publishamerica.net/service/newhardcover.html (last visited June 1, 2012).

010313-11 525581 V1

43.   Defendant charges its authors $50 for a copy of their own contract[48] or their own

manuscript.[49]  If authors would like weekly statements of their book sales, defendant charges

$49.[50]  Otherwise, for a sales statement outside of the normal contractual periods, defendant

charges $99.[51]  For $49, defendant will also put an author's book on Facebook.[52]  These are

services that any reputable company would provide free of charge.  Similarly, it charges $99 to

issue a press release to the local media letting them know that the book has been published and

notifying them of any book signings or readings the author may have scheduled.[53]  Upgrade to

$399 and defendant will not only issue press releases to local media, but will "serve as a go-

between," between the author and the media, to "pass on any messages readers may have for

you" – services that should reasonably fall within its contractual obligations, and it promises

vaguely to "contact celebrities and Hollywood studios for proposals."[54]

44.   It also charges for substantive editing.  For $599 to help its authors rewrite their

books,[55] or $49 just to rewrite the back cover.[56]

---

[48] *Copy of Contract - $50*, PublishAmerica, http://www.publishamerica.net/service/product170.html (last visited
June 1, 2012).
[49] *PDF Copy of Manuscript*, PublishAmerica, http://www.publishamerica.net/service/product277.html (last visited
June 1, 2012).
[50] *Weekly Sales Update*, PublishAmerica, http://www.publishamerica.net/service/WeeklySalesUpdate.html. (last
visited June 1, 2012).
[51] *Royalty Statement*, PublishAmerica, http://www.publishamerica.net/service/product57.html (last visited June 1,
2012).
[52] *Facebook*, PublishAmerica, http://www.publishamerica.net/service/MyFacebook.html (last visited June 1, 2012).
[53] *Headline Publicity Package*, PublishAmerica, http://www.publishamerica.net/service/Headline.html (last visited
June 1, 2012).
[54] *Breaking News Publicity Package*, PublishAmerica, http://www.publishamerica.net/service/BreakingNews.html
(last visited June 1, 2012).
[55] *Re-writing Service*, PublishAmerica, http://www.publishamerica.net/service/product195.html (last visited June 1,
2012).
[56] *Back Cover Text Rewrite*, PublishAmerica, http://www.publishamerica.net/service/BCTRewrite.html (last visited
June 1, 2012).

45.    It even charges for status updates.  For $79 authors can purchase weekly updates on the sales of their books and defendant's promotional projects.[57]  If they opt for monthly updates, the price drops to $49.[58]

**2.    Defendant offers services that are not reasonably designed to promote book sales.**

46.    Defendant does not have the means to support genuine marketing support for its authors.  One industry observer concludes:

> They are certainly not an author solutions service of any kind because they again lack transparency and are not even equipped with the paid-services better author solutions services offer, like a competitively priced book; a prescribed and effective template of marketing aid for an author; a properly developed network of both physical and online distribution and availability; a contract based on non-exclusive terms; a strategy that has properly considered the advent of e-books; and most importantly of all, a reputation that is remotely salvageable in the book publishing and retail industries.[59]

47.    Instead, defendant provides services that are not reasonably designed to market the books, like offering to send a message to government officials and the media for $29, that the company was helping to create jobs by signing up more authors.  "We're going to tell [P]resident Obama and the leaders in the House and the Senate, and your local U.S. Representative, that because of you, and authors like you, new American jobs are created..  And we'll send the exact

---

[57] *Weekly Author Briefing*, PublishAmerica, http://www.publishamerica.net/service/WeeklyAuthorBriefing.html (last visited June 1, 2012).
[58] *Monthly Author Briefing*, PublishAmerica, http://www.publishamerica.net/service/MonthlyAuthorBriefing.html (last visited June 1, 2012).
[59] Rooney.

same message, naming you, to your local TV station," defendant's pitch said.[60]  Along the same

lines, defendant has also offered to donate books to Oprah Winfrey or Tom Hanks for a fee.[61]

48.    Other examples include offers to "present" books (but not to provide copies) "to

the newsrooms of Ladies Home Journal, Glamour, O, the Oprah Magazine, Redbook,

Cosmopolitan, Marie Claire, and Martha Stewart Living" for $22.[62]  Defendant also offers to

display its authors' book at defendant's regional author conventions.  The cost is $149 if the

book is displayed in all ten conventions, or $79 if limited to one region.[63]  For $29 a book will

appear on defendant's online broadcast, showcasing its own books.[64]

49.    As another example of useless services, defendant states that at the Washington

book festival, it distributes its own publication, the Washington Courier with "all-positive book

reviews."[65]  Authors can pay $49 to include their own 25-word entry, or for $69, they can secure

an "all-positive" review of their book.[66]

50.    Defendant also offers services that are wholly inconsistent with its role as a non-

vanity publisher.  For example, for around $200, it previously offered to market an author's

"book to big ticket publishers such as Random House, Simon and Schuster, HarperCollins,

Penguin, the new Amazon publishing company, but also university presses and independent

---

[60] *PublishAmerica "Promotions" Repudiated*, Publishers Weekly, (Aug. 18, 2011),
http://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/48403-publishamerica-promotions-repudiated.html.
[61] Victoria Strauss, *Taking Famous Names in Vain*, SFWA, (Aug. 18, 2011, 6:04 AM),
http://www.sfwa.org/2011/08/taking-famous-names-in-vain.
[62] *Mom*, PublishAmerica, http://www.publishamerica.net/service/Mom.html (URL no longer available).
[63] *All conventions*, PublishAmerica, http://www.publishamerica.net/service/AllConventions.html (last visited June 1, 2012).
[64] *Tues TV*, PublishAmerica, http://www.publishamerica.net/service/TuesTV.html (last visited June 1, 2012).
[65] *Congress Ad*, PublishAmerica, http://www.publishamerica.net/service/CongressAd.html (last visited June 1, 2012).
[66] *Id.*

010313-11 525581 V1

publishers, and to a host of foreign publishers all over the world."[67] Not only is this practice

inconsistent with defendant's role, it is highly unlikely that such select publishers – which will

not even review manuscripts unless submitted by a reputable agent – would accept defendant's

recommendations. But defendant counts on its authors' inexperience with the publishing

industry. For example:

> Dear Author:
>
> PublishAmerica will submit your book to Random House! Random House, the publishing company? Yes. We're submitting your book to the world's most famous publisher so they get a chance to read it and see if they want your book.
>
> Every writer dreams about becoming a published author. Once they have reached that goal, as you have, many dream of the next step up: to become a Random House author. Random House is one of the most prestigious publishing names. Their extensive operation a few miles from our own headquarters makes them virtual neighbors.
>
> We will submit not one, but up to five copies of your book to Random House's acquisition editors, so that they can also pass the book around their imprints if they want. They may do anything they choose with the books. We will alert you immediately if Random House shows interest, and in that case we will do everything we can to ensure a smooth transition. Since PublishAmerica is not affiliated with Random House or its owner Bertelsmann, we would totally share in your pride.
>
> Here's how we do it:
>
> If you want to have books on hand, order now, and we will donate up to five copies to Random House. And you receive a 50 pct discount!

---

[67] Jim G. Payne, *Beware of PublishAmerica... Or be prepared to get out your checkbook!*, Jim G. Payne WordPress Blog, (July 10, 2011), http://jimgpayne.com/2011/07/10/beware-of-publishamerica-or-be-prepared-to-get-out-your-checkbook/. *See also* PA email solicitation *Live from London* (Apr. 4, 2012, 7:14 AM), http://christianityforthinkers.com/PublishAmericaNewScan/PA-London-ns-4-14-12.pdf (offering to talk to Amazon about publishing its authors' books for a fee).

> Go to www.publishamerica.net, find your book, click on it, then
> add to cart, indicate quantity, and use this coupon: Random50.
> Then click Recalculate and finish the transaction. Minimum
> volume is 10 copies.
>
> By using the coupon you are authorizing us to donate the books to
> Random House. You may also request that we ship five FREE
> books to you instead.
>
> Full-color and hardcovers excluded. Offer expires this weekend on
> Sunday night.[68]

51.    This service is not unlike the $49 fee defendant charges to submit its clients'

books for the Nobel Prize recommendation[69] or charging them for submitting their books to the

London Review of Books.[70]

52.    Defendant also charges to have ebooks published on Barnes & Nobel, Amazon,

Wal-Mart, Kobo, iBook, and Google, even though each of these sites allows authors to upload

their works as ebooks for free.[71]

53.    Defendant's promotions are those of a rank amateur or parodist. Consider, for

example, its "Hey Amazon" promotion:

> Now that **Book Expo America** has invited us to take the
> promotion space right across from Amazon, how
> about we add your book to this banner:

---

[68] Reprinted in Mick Rooney, *PublishAmerica Invite Themselves To Dinner At Random House*, Indep. Publ'g
Magazine, (Feb. 25, 2010), http://mickrooney.blogspot.com/2010/02/publish-america-invite-themselves-to.html.
[69] Confirmed by documents provided to plaintiffs' attorneys in the preparation of this lawsuit.
[70] Strauss.
[71] *Id.*



We'll put the banner with your book cover strategically across from the Amazon pavillion during all 4 Book Expo America days in New York, all day!

It's a big banner, 83" x 32". Can't be overlooked!

Reserve your book's Hey Amazon space for $99.[72]

54.     On its website, defendant advises: "PublishAmerica attends trade shows all over the world, from New York to Jerusalem, from London to Paris, from Calcutta to Tokyo to facilitate promotion to targeted micro and macro audiences.  Each year, roughly five thousand PublishAmerica authors volunteer to advertise their book before, during or after such trade shows at their own expense."[73]  But defendant does not tell its authors that promotions at book

---

[72] http://www.publishamerica.net/service/HeyAmazon.html (URL no longer available).
[73] http://www.publishamerica.com/facts/index.htm (URL no longer available).

fairs, are such amateurish attempts, like its "Hey, Amazon" banner, are, moreover, only available on a fee-for-service basis.

55.    Once its authors are signed up, they are directed, through defendant's promotional emails to its online service list at http://www.publishamerica.net/service.  There (or through the promotional emails) the authors learn, for example, that defendant will not display its authors' books at the Book Expo unless the authors pay for that privilege: minimally $49,[74] but if the authors pay $79, they can have their books displayed at the front of the table,[75] and if the authors want defendant to discuss their books knowledgeably at the Expo, defendant charges an extra $79.[76]  For $149, the authors may appear at defendant's booth for up to an hour.[77]  Make it $299, and defendant will also throw in five "free copies" of the author's book to be given away at the Expo.[78]

**3.    Defendant falsely represented the services it offered.**

56.    Defendant's most public false representation was its offer to present its authors' books to J.K. Rowling.  Defendant made its authors the following offer for a $49 fee:

> We will bring your book to the attention of Harry Potter's
> author next week while our delegation is in her hometown,
> and ask her to read it and to tell us and you what she thinks.
> Tell her what you think: in the Ordering Instructions box write
> your own note for JK Rowling, max. 50-100 words.  We will
> include your note in our presentation for her![79]

---

[74] *BEA*, PublishAmerica, http://www.publishamerica.net/service/BEA.html (URL no longer available).
[75] *BEA Front*, PublishAmerica, http://www.publishamerica.net/service/BEAFront.html (URL no longer available).
[76] *BEA Agent*, PublishAmerica, http://www.publishamerica.net/service/BEAagent.html (URL no longer available).
[77] *BEA Top*, PublishAmerica, http://www.publishamerica.net/service/BEAtop.html (URL no longer available).
[78] *My Book Expo America Show*, PublishAmerica, http://www.publishamerica.net/service/MyBEAshow.html (URL no longer available).
[79] Carolyn Kellogg, *J.K. Rowling and PublishAmerica's Unfulfillable Promise*, L. A. Times, (Aug. 18, 2011, 5:42 PM), http://latimesblogs.latimes.com/jacketcopy/2011/08/jk-rowling-publish-america.html.

Not true. "A spokesperson for Rowling said the claim was 'completely false' and that Rowling would take 'appropriate action.'"[80]

57.     Another pitch said PA would take copies of authors' works to the Edinburgh International Book Festival, but a fair spokesperson said there was no such arrangement.[81]

58.     Defendant's promotion had stated:

> Your book. In Scotland. Next month. Edinburgh is famous for its annual August downtown book festival where it is all about authors, writing contests, literary Nobel prize winners, and the general Scottish audience who come to see who and what is new in the English language. Big publishers are everywhere. Newspaper reporters are everywhere. The famous Guardian newspaper is a top sponsor. PublishAmerica is at the festival, promoting our best authors.[82]

Defendant offered its authors a choice of three options for them to buy space in a catalogue "that we will present to the festival."[83]

59.     A spokeswoman for the Edinburgh International Book Festival refuted defendant's claim:

> There is not, nor has there ever been, any association between the Edinburgh International Book Festival Ltd and PublishAmerica. There are no meetings scheduled between any representative of the parties, and we are not aware of any participation by PublishAmerica or any of its authors or agents in this year's festival.[84]

---

[80] *Id.,* (quoting Publishers Weekly); *see also Rowling Rep: US Publisher Wrong About Meeting,* Huffington Post, (Aug. 16, 2011), http://www.huffingtonpost.com/huff-wires/20110816/us-books-rowling-publishamerica/.

[81] *PublishAmerica "Promotions" Repudiated,* Publishers Weekly, (Aug. 18, 2011), http://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/48403-publishamerica-promotions-repudiated.html.

[82] Strauss (quoting article in *The Bookseller,* which is no longer available online).

[83] *Id.*

[84] Brian Ferguson, *Book Festival Organisers Refute US publisher's Claims of Access,* Festival News, (Aug. 25, 2011), http://www.edinburgh-festivals.com/viewnews.aspx?id=3213.

010313-11 525581 V1

60.     The Book Festival served a cease and desist notice on defendant and issued a statement denying the existence of a relationship between itself and PublishAmerica, and accusing defendant of "falsely portray[ing] the nature of the festival and the likelihood that the purchase and inclusion in the 'Scotland' catalogue will result in attention from the Festival and/or publishers."[85]  Defendant made a similar claim in 2011 about Graph Expo in Chicago. One of the organizers of that event also denied any association with defendant or that defendant would be present at the expo.[86]

61.     Defendant also sent another solicitation in August 2011, claiming that for $39 defendant would send its delegation to the National Library of Scotland to "introduce them to your book."[87]  A spokesman for the National Library of Scotland denied the claim:  "We can confirm we have absolutely no relationship with PublishAmerica."[88]  The press agent for the National Library further explained "our collections policy is based on the expertise of our curators rather than lobbying by any publisher."[89]

62.     Defendant offered to present its authors' books to Christian bookstores through CBA, formerly known as the Christian Booksellers Association at a cost of $49 to $99, depending on which option they chose.[90]  Although defendant included a disclaimer that it had "no affiliation with the CBA and/or individual Christian bookstores beyond that of a regular publisher/bookseller relationship," CBA found the solicitation sufficiently misleading that it posted a warning to Christian authors on its website:

---

[85] *Id.*
[86] Email provided to plaintiffs' counsel.  This email is also reproduced by Ms. Commerford on Paula's PublishAmerica Information Site, available at http://paulaspublishamericainformationsite.weebly.com/.
[87] Email provided to plaintiffs' counsel.
[88] Ferguson.
[89] Email provided to plaintiffs' counsel.
[90] Strauss.

- 26 -

CBA has been informed that Christian authors are being contacted
by an organization called PublishAmerica that's soliciting for
authors to submit their books to a sales/marketing catalog that they
claim will be going to CBA.  Please be aware that CBA has no
knowledge of PublishAmerica; that PublishAmerica is not
connected to Christian Store Week; and that CBA has no
agreement of any kind with PublishAmerica, nor is CBA affiliated
in any way, shape, or form with that organization.[91]

63.     Shortly before New Year's Day 2012, defendant sent a solicitation to its authors

with the subject line "Subject: Your book in Parade magazine":

Dear author:

"Nothing happens until somebody sells something."

This famous line was coined by Parade, by far the nation's largest
magazine.

Parade has a weekly circulation of 32 million, is inserted in more
than 500 newspapers, and is read by 70 million Americans.

We are going to bring you and your book to the attention of
Parade!

No other print medium introduces so many positive stories and
positive people to its readers.  Parade is beloved by everyone who
finds it in their Sunday newspaper.  Once somebody, or something,
is presented to the American people by Parade, instant fame and
recognition is virtually assured.

Your book connects to regular people on Main Street.  Every-day
folks can identify with your own life story.  All you need is a big
magnifying glass, so that a crowd gets to hear about you and your
book.  Parade is often such a magnifying glass.

We're going to tell Parade about you and your book.

Go to www.publishamerica.net/service/Parade.html
<http://publishamerica.us2.list-
manage2.com/track/click?u=a0d6d6a3715a8baccbe0fbb7c&id=d4
4ef64eef&e=ec72fff305> to activate, for $49.  Your book and
name will be included in our presentation to Parade.  We will urge

---

[91] *Warning to Christian Authors*, CBA,  http://www.cbanews.org/article.php?id=3753 (last visited May 21, 2012).

them to review and pursue your story for one of their mid-January
or later issues.  Parade serves America's Main Street, and so does
your book![92]

64.     While defendant disclaimed any "affiliation" with Parade or "preferential access

or other special treatment," the solicitation certainly suggests that defendant has a professional

relationship that would allow it to present its authors' works.

65.     Parade's vice president of communications denies this is the case:

We do not, in fact, have a business relationship with
PublishAmerica.  Thank you for bringing this to our attention – I
will be sure to share with our executive and legal teams.[93]

66.     In February 2012, defendant sent its authors an email with the subject line, "US

State Department wants your book."[94]



Dear author:

# The U.S. State Department wants your

# book.

## They promote American literature abroad.

We have been contacted by the **U.S. Consulate General** in Leipzig,

---

[92] Email provided to plaintiffs' counsel.  This email is also reproduced at Paula's PublishAmerica Information Site
available at http://paulaspublishamericainformationsite.weebly.com/.
[93] Id.
[94] Email provided to plaintiffs' counsel.  This email is also at Paula's PublishAmerica Information Site available at
id.

Germany. They want to present our best books during the **Leipzig Book Fair** next month. Last time around PublishAmerica also promoted its best books in Leipzig, together with the American consulate.

## Activate today if you want your book to be sent to the U.S. Consul General.

Go to www.publishamerica.net/service/StateDept.html to activate for **$39**. Your book will upon being selected be sent to Leipzig for promotion and display during the Leipzig Book Fair in the U.S. Consulate General's booth. After the event it will be donated to a public or university library. If for whatever reason your book doesn't pass the selection process, you will receive a **full refund** of your activation fee.

Must choose a shipping option to activate. No use of coupons allowed. Valid for one title at a time. Mention your book title.

Thank you,
--PublishAmerica Bookstore

*Copyright © 2012 PublishAmerica, LLLP, All rights reserved.* [95]

67.    Ms. Paula Commerford, former PublishAmerica author, forwarded the message to the U.S. Consulate to find out whether the promotion was false.  The State Department responded:

> Dear Ms. Commerford,
>
> Thank you for your email.  The U.S. Consulate Leipzig is not aware of the company you wrote about, nor do we request companies or organizations to solicit books for a fee on our behalf.

---

[95] *Id.*

Kind regards,

U.S. Consulate General
- Public Affairs –
Wilhelm Seyfferth-Str. 4
D - 04107 Leipzig Tel.: 0341 / 213 84-0

68.   The State Department also sent a second email:

Dear Ms. Commerford,

As a follow up to your email, I reviewed our records again. Thank you for bringing this situation to our attention.

.... We take reports of misrepresentation very seriously and our consulate would never knowingly work with companies that solicit book donations for a fee. ....[96]

69.   In March 2012, defendant offered to convert its authors' books (starting at $59) to

ebooks for the Canadian company, Kobo, with which it falsely claimed to have a contractual

relationship:

Yesterday PublishAmerica inked a deal with Kobo to make your e-book available to readers in Canada, and in 170 other countries! Kobo's majority owner is Canadian book giant, Indigo Books & Music. Indigo is Canada's largest bookseller. With its own e-reader, the company competes with Amazon's Kindle and Sony for who's #1 in the world. With Kindle and Nook you mostly only cover the U.S. market. With Kobo you add the rest of the world! And it gets even better: Best Buy now makes Kobo's e-reader available in Best Buy stores all across America. And, yes!, Target now also sells Kobo e-readers!! Oh, wait, Walmart also sells Kobo!!! PublishAmerica will convert your book to a Kobo e-book, immediately available in Canada, 170 other countries, and through Walmart, Best Buy and Target. Our expert e-book conversion team will upload your new e-book format quickly to Kobo for prompt availability in Canada, 170 other countries, and

---

[96] Emails provided to plaintiffs' counsel.

> through Walmart, Best Buy and Target!!  You will receive notice
> as soon as Kobo has made your e-book "live."[97]

70. . Former PublishAmerica author Paula Commerford forwarded the solicitation to

Kobo who responded:

> Thank you for your patience.  I can confirm that Kobo does not
> have a signed agreement with PublishAmerica.  The internal Kobo
> team is investigating this claim at present.[98]

71. Also in March of this year, defendant falsely claimed that for a $25 fee it would

present its authors' books in all of the Florida bookstores:  "we'll cover every bookstore, and that

includes every Costco and Sam's."[99]  Again Ms. Commerford sought confirmation.  Costco

affirmatively denied any "affiliat[ion] with this program."[100]

### 4. To perpetuate its fraud, defendant scrubs its website of any negative comments and attacks the credibility of its detractors.

72. Consumers looking to publish their books for the first time may not know what to

look for in a publisher:

> Do you have a book you want to see published? If you type "book
> publishers" (or, as I did, "Christian book publishers") into your
> search engine, one of the first entries is likely to be
> PublishAmerica. Their motto sounds great: "We treat authors the
> old-fashioned way—we pay them."[101]

Unless authors actively search for reviews of PublishAmerica, they may not ever learn of its

deceptive business practices.

---

[97] Emails provided to plaintiffs' counsel, also partly reproduced on Paula's PublishAmerica Information Site, available at http://paulaspublishamericainformationsite.weebly.com/.
[98] Id.
[99] Id.
[100] Id.
[101] Davidson.

73.     Defendant also takes care to limit its exposure.  The testimonials and postings on the PublishAmerica Message Board say wonderful things about PublishAmerica, but on other websites PublishAmerica authors complain that PublishAmerica prohibits negative postings.[102]

74.     Many PublishAmerica authors believe that defendant arranges for trolls on websites that criticize defendant, *i.e.* people who respond to negative comments about PublishAmerica by disparaging the commenters.[103]

75.     Former PublishAmerica author, Paula Commerford, has forwarded several of defendant's solicitations, *e.g.* the offer to send books to the American Consulate or the offer to promote books at the Edinburgh International Book Festival, to the organizations or persons involved, to see whether there was any truth to defendant's claim.   Defendant sent Ms. Commerford a "cease and desist" letter on February 20, 2012, claiming that she sent a "false and disparaging email" about defendant to the "American Consulate in Leipzig," "Maryland agencies," and "media organizations."[104]  Ms. Commerford has declined, noting that the documents she posts on her website, *i.e.* defendant's solicitations and the responses from the relevant parties, speak for themselves.[105]

76.     Defendant even demanded that J.K. Rowling issue a "retraction" to her statement disavowing any connection with defendant.[106]  J.K. Rowling apparently also declined.

---

[102] *Id.*

[103] *See, e.g.*, daisyf1305, *PublishAmerica Scam*, Hubpages, http://daisyf1305.hubpages.com/hub/Publish-America-scam (comments by and about blogger Larry Chiapelli); http://absolutewrite.com/forums/showthread.php?t=166870 (referring to Rebecca and Larry as possible trolls) (last visited June 1, 2012).

[104] Paula's PublishAmerica Information Site, available at http://paulaspublishamericainformationsite.weebly.com/.

[105] *Id.*

[106] *See infra J.K. Rowling and PublishAmerica's Unfulfillable Promise.*

010313-11  525581 V1

**D.      Plaintiffs were Duped by Defendant.**

     **1.      Darla Yoos lost her publication rights and roughly $1,500 for bogus services.**

     77.     Ms. Yoos spent years writing *Diary of a Demonologist* before she agreed to be published by defendant. She sought out defendant because she wanted a local publisher and defendant purported to be a traditional publisher. She purchased many services from defendant to promote her book, including:

    a) **March 7, 2012**: the Breaking News Publicity Package $399 with tax and shipping $427.93;

    b) **March 7, 2012**: My Own Literary Agent $99 with tax and shipping $109.93;

    c) **March 12, 2012**: Kindle, Nook, Google publication $149 with tax and shipping $162.93.

    d) **March 16, 2012**: 1500 Bookstores Promotion $149 with tax and shipping $164.93;

    e) **March 16, 2012**: All Conventions Promotion $149 with tax and shipping $164.93;

    f) **March 16, 2012**: Hollywood Resources Promotion $69 with tax and shipping $80.13;

    g) **March 21, 2012**: Author Efficiency Package $59 with tax and shipping $67.53;

    h) **March 21, 2012**: Screenplay Promotion $89 with tax and shipping $99.33;

    i) **March 23, 2012**: Softcover Option $79 with tax and shipping $88.73; and

    j) **March 23, 2012**: Big Cities Promotion $29 with tax and shipping $35.73.

Plaintiff objected to shipping and handling service charges, since these services did not involve any shipping.  Defendant did not respond to her objections, so she paid the fees to obtain the services.

78.     As part of the "Breaking News Publicity Package," defendant agreed to provide "[p]rofessionally written press releases."[107]  PublishAmerica issued the following press release:



_____For Immediate Release

Contact:     Shawn Street – Public Relations
**pr@publishamerica.com**
www.publishamerica.com


**PublishAmerica Presents** *Diary of a Demonologist* by Darla Broadwater

Frederick, MD April 2, 2012 -- PublishAmerica is proud to present *Diary of a Demonologist* by Darla Broadwater.

People dream of second chances.  We all long for a warning of the consequences of direction our life is heading.  For Liz Pearson, this longing was answered in ways she would never have imagined.

What if you had plenty of second chances?  What if you were warned what would happen if you kept in the direction that you were currently on in your life?  For Liz Pearson, that prayer was answered in ways she would never have imagined.  You've been warned...

Darla Broadwater lives in Maryland with her husband, son and dog.

---

[107] Document provided to plaintiffs' counsel.

- 34 -

PublishAmerica is the home of more than 50,000 talented authors.
PublishAmerica is a traditional publishing company whose
primary goal is to encourage and promote the works of new,
previously undiscovered writers.  Like more mainstream
publishers, PublishAmerica pays its authors advances and royalties
and makes its books available through all bookstores.
PublishAmerica offers a distinctly personal, supportive alternative
to vanity presses and less accessible publishers.

Visit us online at
http://www.facebook.com/publishamerica.publisher and
www.publishamerica.com.

END[108]

79.     Ms. Yoos soon came to realize she had been conned.  The only signs of the

Breaking News Publicity Package were a single canned email from March 8 and the bare bones

press release.  Ms. Yoos contacted the point of contact for the package by the only means

available (email) and received no responses.  With respect to her literary agent, she received only

a single email on March 7, purportedly showing that her book was being presented to a publisher

in Athens, Greece, which did not seem like an action reasonably likely to promote her book.  She

was provided no contact number and received no other responses from her purported literary

agent.  She received a single canned response on March 19 from the Hollywood Resources

Promotion and one from the Screenplay Promotion on March 21.  Otherwise, she received no

updates or status confirmations from any other promotions.

80.     By late March, Ms. Yoos also realized that defendant had priced her book at

$24.95, a price too high to compete with other books by first-time or little known authors.

Defendant informed her that she would be charged $399 to lower the price of her book to $10.95,

and that the charge would be applied twice to cover both the printed and ebook editions.

---

[108] Document provided to plaintiffs' counsel.

Plaintiff objected to the charge. She also questioned whether the promotions she purchased had been performed and asked to be released from her contract so that she could pursue a genuine traditional publisher.

81.     Defendant ignored her request to be released and responded only to her other objections:

> Dear Darla Broadwater [*i.e.* Yoos]:
>
> Thank you for your inquiry. No, what you say is false. All services that you paid for have either been performed, or are being performed. You will not be given any refund, at all. Please do not ask us again.
>
> We do not know what you mean by $800. Please do not send us such a message again. If you do, we will delete it. If you want to lower the price of your book, please read the following carefully. If you ask us questions, in a coherent, normal, and polite manner, then we will help you. Otherwise we will not.
>
> We will agree to lower the price, even though it goes against our experience over the past 12 years in this industry.
>
> You are not alone in your thinking. Price is not the reason that your book is not selling, but if you think that it is, we have a solution for you. But, we have a responsibility to our employees, to ensure that we make a profit. If we do not do that, we would go out of business very quickly.[109]

82.     Ms. Yoos asked to be released from her contract. Defendant responded:

> We have received your request to terminate your book's contract. As a general rule, publishers are not in favor of that. When a publisher agrees to contract a book, it is done with an expectation of entering into a profitable venture. PublishAmerica never charges any of its authors any money in return for producing and publishing their book and making it available to a worldwide audience. This is why we enter into contracts with a seven-year lifetime, which affords the book ample opportunity to turn a profit.

---

[109] Document provided to plaintiffs' counsel.

If your request was granted, PublishAmerica would be denied, prematurely, any hope of recovering its expenses. This is why we would prefer to keep the contract in place until its expiration date.

Therefore, if you were to persist on wishing to relinquish your status as a published author, we can only grant your request if you agree to a $299 compensation payment, which will help to offset some of our losses. If you want to proceed with termination, please go to: http://www.publishamerica.net/service/product9.html. Be sure to enter your book's title in the "order comments" field. If not, we will both understand and applaud your decision. As said, we prefer to keep the book under contract.

Thank you,

PublishAmerica Support
http://publishamerica.com/support/

Please do not reply to this message. If you have a further question, please use the form link above, and we will be happy to answer.[110]

83.     Ms. Yoos objected:

Good morning,
I received the link to the reverting rights- thank you. My question: why is the price so high? I have spent so much money already and cannot see what the loss would be (other than my own) that it would incur a $299 (plus tax and shipping) charge. This price was $99 and $149 not too much more than a year ago.

Thanks!
Darla

84.     Defendant responded:

Thank you for your inquiry. Actually, that fee is very low. What we have done for you already costs about $1500 in the vanity publishing industry. But, because we believe that your book deserves to be published, we published your book for free, in the traditional manner, for free.

---

[110] Document provided to plaintiffs' counsel.

As far as publishing your book goes, you don't have to spend a
cent to get published. All is included. All other services are
entirely optional.

We have done quite a bit of marketing for you already, although
we are not required to do so. We acquired, vetted, designed,
produced, published, and made your book available to booksellers
worldwide at exactly zero cost to you. We took care of all the
technical and graphical details, we issued your book's unique
ISBN, we produced a beautiful book with high quality cover art,
and we put it in the hands of five printing companies on four
continents, all at no cost to you. Although the contract does not
require us to do any marketing, as you can see, we usually go
above and beyond what the contract requires.

Separately, we do offer optional fee-based marketing services, to
give your book a wider audience, and to make you and your book
more popular.

PublishAmerica is hosting authors conventions!
Register at http://www.authorsconvention.com/

PublishAmerica Support
http://publishamerica.com/support/

Follow us on Twitter at @PublishAmerica!
Like us on Facebook: http://www.facebook.com/PublishAmerica
We have 16,000 Likes![111]

85.     On April 9, 2012, defendant charged Ms. Yoos $320.93 to be released from her

contract.

86.     Ms. Yoos seeks the return of the price she paid for of all defendant's purported

services, including the release from her contract.

**2.     Defendant published Edwin McCall's book riddled with errors and then
refused to correct them unless he paid for it.**

87.     Plaintiff Edwin McCall spent years writing *Dirty Potatoes and other Short Stories*

and was initially thrilled when defendant agreed to publish it.  He believed that defendant was a

---

[111] Email provided to plaintiffs' counsel.

traditional publisher and that it would do its part to promote his book.  Soon after signing, he

learned that this was not the case.

88.    Mr. McCall was forced to publish his work with errors on over 40 pages.  When

Mr. McCall pointed out these errors prior to publication, defendant refused to correct them

unless he paid defendant:

> If you insist on us making these changes anyway, we must charge
> you $99 for rescheduling text department assignments.  For that
> fee we will be able to make up to 5 pages of changes.  You have
> submitted more than 5 pages.  Please let us know if you wish to
> have all of the pages considered, so we can let you know the cost.
> Please let us know how you would like us to proceed.  If you opt
> for having the change implemented, we will call you for your
> credit card information.[112]

Because he could not afford to pay for the corrections, Mr. McCall's book was published with

multiple errors.

89.    A couple of months later, defendant sent him the following solicitation in which it

offered to make limited changes if he purchased at least nine of his own (print on demand)

books, which again Mr. McCall could not afford:

> From: support@publishamerica.com
> To: [email]
> Date: Tue, 27 Oct 2009 10:45:52 -0400
> Subject: Make Text Changes to Your Book at PublishAmerica
>
> Dear Author,
>
> Want to make changes to the text of your book?  You can make
> them now!
>
> First, PublishAmerica lowered all retail prices.  Next, we slashed
> shipping fees by 75 pct.
>
> Now we will accept **limited** text changes!

---

[112] Document provided to plaintiffs' counsel in the preparation of this complaint.

If you are among those who wanted to tweak their book's text after it had already gone to print, we have heard you. We understand the frustration of those who aspire to perfection. So, with the holiday gift season rapidly approaching, we're going to work with you.

Go to www.publishamerica.net, find your reduced-priced book, click on it, then add to cart, indicate quantity, and use this coupon: Correct40. Then click Recalculate and finish the transaction. Minimum order volume is only 9 copies. Plus you qualify for a wholesome 40 pct discount on the already reduced price! Fullcolor books are included.

The coupon indicates that you want to make text changes to your book. No need to leave any instructions; we will automatically contact you to coordinate production. Nature and quantity of the changes must be limited (spelling, grammar, no major overhaul).

We will not charge for making the changes. And **the books you order will be printed with the corrected text!** To allow for a timely production before the holiday season starts, this offer must expire this Sunday, November 1. With your help we will make every effort to have the books on your doorstep expeditiously.

Happy Halloween!

PublishAmerica Author Support Team[113]

90.     Despite his misgivings, Mr. McCall fulfilled his end of the contract. He sent his friends and family hundreds of emails about his book and where to find it. He also took it upon himself to contact many other people about his book, including newspapers, magazines, radio and TV stations. Mr. McCall found the process counterproductive, that having the author, rather than the publisher contact the media smacked of desperation. Defendant also listed the book in the wrong category on its website. Mr. McCall's efforts to have it changed went unheeded.

---

[113] Document provided to plaintiffs' counsel in the preparation of this complaint.

91.     Mr. McCall had trusted that defendant was a traditional publisher with an interest in selling his books. Instead, he soon found that defendant continuously solicited him with promotional offers that involved buying his own books.

92.     Mr. McCall was required to locate the local media for defendant for the press release, although he had understood that it was the publisher's job to present the book to the media. While defendant sent him a copy of the press release, he was not included on the communication and had no assurance that defendant had in fact sent it to anyone. Instead, Mr. McCall sent the press release himself.

93.     While defendant offered to provide him a "website type page," this promise did not materialize. Defendant did not reply or even acknowledge the emails he sent requesting help to set up the webpage. This was part of a general pattern of disregarding Mr. McCall's communications. In some cases he received auto-generated emails referring him to the FAQ page on defendant's website, which was not responsive to his questions, in other instances he received no response at all.

94.     Defendant has refused to release Mr. McCall from his contract unless he pays defendant $149. Mr. McCall refuses. Defendant falsely represented itself to him as a traditional publisher and has not taken any reasonable steps to promote his book and ensure the quality of his book.

95.     Mr. McCall seeks the return of his publication rights.

**3.      Defendant took Kerri Levine's publishing rights and charged her for bogus services and then failed to deliver.**

96.     Plaintiff Kerri Levine put in a great deal of time and effort writing her book, *From Catholic to Atheist: Kicking Back with a Godless Heathen*, and wanted to publish with a

- 41 -

traditional publisher, not a vanity press.  On April 30, 2010, she contracted with defendant to

publish her book.  Ms. Levine worked hard to write her book and to promote it.  She entrusted

defendant with her dream of publication and finds it outrageous how defendant has treated her

and other PublishAmerica authors.  In the two years of dealing with defendant, she has sold only

three books (according to defendant's records), and she has not received any royalties.  Ms.

Levine also believes that defendant has not provided the services she purchased:

> a.      Purchase six (6) books and have it featured in a book fair
>         being held in Germany in 2010;
>
> b.      Purchase four (4) books (Correct 30 was the code) and get
>         some typos corrected; and
>
> c.      Purchase five (5) books for the Zoftcover promo and drop
>         the price of my book from $24.99 to $7.99.

97.     Defendant has provided no proof that her book was featured at the book fair in

Germany or that the publication errors were corrected.

98.     In January 2012, approximately a year after she purchased the service to lower the

price from $24.99 to $7.99, Ms. Levine learned from some of her friends, who tried to order her

book that the price was still listed at $24.99.  She immediately wrote to defendant to demand that

it change the price as promised.  Defendant ignored her request and instead suggested she pay

another fee to "convert" her softcover book to a hardback:

> From: PublishAmerica Author Support
> <noreply@publishamerica.com>
> Date: January 18, 2012 9:40:10 AM CST
> To: [email address]
> Subject: Kerri Levine: Book price / Your book in hardcover for
> same price
> Dear Kerri Levine:
>
> Thank you for asking about the price of your book.  Your say that
> your book is priced too high?  How about we change the format to

010313-11 525581 V1

hardcover?  The retail price will remain unchanged, but the sharply increased value of a hardcover leaves every customer satisfied.

Our pricing has been tried and tested over the course of twelve years.  We have sold millions of books, which solidly supports how we read the market.  So, you may be happy to hear that PublishAmerica is moving from softcovers to hardcovers.  All of our 2012 releases will be hardcovers only, and will retail for the same price as our softcovers.  You may activate the conversion here:

http://www.publishamerica.net/service/newhardcover.html

PublishAmerica already carries more than 10,000 titles in hardcover.  Everybody loves them.  So will you.  Especially because customers will pay the same for your book in high-value hardcover.

Thank you for filling out the form, and helping us to help you faster!

PublishAmerica Support
http://publishamerica.com/support/

Follow us on Twitter at @PubAmericaNews!
Like us on Facebook:  http://www.facebook.com/PublishAmerica

Thank you for filling out the form, and helping us to help you faster!

PublishAmerica Support
http://publishamerica.com/support/

Follow us on Twitter at @PublishAmerica!
Like us on Facebook:
http://www.facebook.com/PublishAmerica[114]

99.     Although the books are not printed until they are ordered, defendant charges an

$89 fee to "convert" a softcover book to hardcover.[115]

---

[114] Email provided to plaintiffs' counsel.

- 43 -

100.    On January 22, 2012, Ms. Levine asked defendant to release her from her

contract. She reminded defendant that it had received money from her for services: "PA took

money from me twice, once for having my book displayed in Germany at the Book Fair you

claimed to have a large booth at, and second for re-adjusting the price of my book down from

$24.99 to $7.99. If you cannot provide proof that I received these services for which I can prove

I paid for, then you also engaged in theft by deception."[116]

101.    Defendant responded with the subject line "Kerri Levine: nonsense email

ignored / cannot backup her own words":

> **From:** PublishAmerica Author Support
> <noreply@publishamerica.com>
> **Date:** January 23, 2012 8:27:41 AM CST
> **To:**[email]
> **Subject: Kerri Levine: nonsense email ignored / cannot backup
> her own words**
>
> Dear Kerri Levine:
> >>you also engaged in theft by deception
>
> Do you have any proof of this? Do NOT send us a message again
> making such a fool of yourself. You cannot even back up you own
> words. Yes, we did all we claimed to do, and more. Please contact
> an attorney prior to sending us such nonsense. Your attorney will
> tell you that your contract remains fully in effect and legally
> enforceable. Your attorney will also tell you that the contract has
> not been breached, in any way.
>
> Our reputation is stellar! We have been growing, for 12 years!
> We have 57,000 titles under contract. And THOUSANDS of the
> authors keep telling the world how happy they are:
> http://www.publishamerica.com/testimonials/index.php. Over
> 4,000 now, unsolicited. That, of course, is the real story.
>
> All those anonymous posts you see online, most often from people
> who have never had any connection to PublishAmerica: all lies

---

[115] *New Hardcover*, PublishAmerica, http://www.publishamerica.net/service/newhardcover.html (last visited June 1, 2012).
[116] Email provided to plaintiffs' counsel.

and half-lies. If even ten percent of it were true, PublishAmerica would have been out of business a long time ago.

Per your contract no payment is due to you until your royalties due have accumulated the dollar amount in royalties that is described in your contract. This threshold is probably the same for other books that you may have published with us as well.

Also, please understand that although there may indeed have been recent sales, our statements will only show sales from that royalty period for which we have been paid. Some retailers and distributors have a grace period of 30, 60, or even 90 days. Any sales not shown on one statement should certainly be included on the next.

The BBB also gave F ratings to Starbucks, Disneyland, and the Los Angeles Times. The BBB has lost credibility, and we can understand why. But at least we are in good company, and the Attorney General's office says that what we do is just fine. Please check the August 2011 Reader's Digest for more information: http://www.rd.com/money/grading-the-better-business-bureau/.

Seems you're a bit behind the times!

Thank you for filling out the form, and helping us to help you faster!

PublishAmerica Support
http://publishamerica.com/support/
Follow us on Twitter at @PublishAmerica!
Like us on Facebook:
http://www.facebook.com/PublishAmerica[117]

102.     Defendant's contention that its F grade puts it in the same class as Starbucks,

Disney and the Los Angeles Times is false. The Better Business Bureau grades these companies

as B, A+, and A+ respectively.[118]

103.     Ms. Levine seeks the release of her publishing rights and the return of the

payment for defendant's publishing and promotional services.

---

[117] *Id.*
[118] *PublishAmerica CEO Makes Excuses for F rating*, Bogus Barrister Blogspot, (May 18, 2012), http://bogusbarrister.blogspot.com/2012/05/publishamerica-ceo-makes-excuses-for-f.html.

- 45 -

## IV.    CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring this action against defendant pursuant to Rule 23 on behalf of

themselves and as representatives of the following class:

> All people who are currently under contract with PublishAmerica
> for the first time for the publication of their literary work(s) and all
> people formerly under contract with PublishAmerica for the
> publication of their literary work(s), who have purchased its
> publication, production or promotion services within the last three
> years.

Excluded from the class are: the defendant, defendant's employees and any entity in which the

defendant has a controlling interest, and their legal representatives, officers, directors, assignees

and successors.

105.    The class consists of thousands of class members geographically dispersed

throughout the United States and the world, making individual joinder impractical, as required

by Rule 23(a)(1).  These class members may be identified from information and records

maintained by defendant.

106.    Plaintiffs are a member of the proposed class.  Plaintiffs' claims are typical of

those of the class because all members of the class were similarly affected by defendant's

wrongful conduct.

107.    Plaintiffs, as representatives of all class members, will fairly and adequately

protect the interests of the class.  Plaintiffs have engaged counsel who are highly experienced

and competent in class action and complex litigation, including litigation involving the

healthcare industry.  Plaintiffs' interests are consistent with, and not antagonistic to, those of the

members of the class.  An effective and practicable manner of notice to such members of the

class can be fashioned by the Court.

108.    Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members. Such common questions of law and fact include:

      a.  Whether defendant's representation that it is a traditional publisher has the capacity, tendency, or effect of deceiving or misleading consumers;

      b.  Whether defendant's representations of its publishing or promotional services have the capacity, tendency, or effect of deceiving or misleading consumers;

      c.  Whether defendant's representations of its publishing or promotional services suggested a sponsorship, approval, status, affiliation, or connection which it does not have;

      d.  Whether plaintiffs and class members were misled by defendant;

      e.  Whether plaintiffs and class members were injured as a result of defendant's deceptive conduct;

      f.  Plaintiffs and class members have conferred a benefit upon defendant;

      g.  Whether it is inequitable for defendant to retain the publishing rights of plaintiffs and members of the proposed class; and

      h.  Whether it is inequitable for defendant to retain payment for services that it misrepresented or failed to carry out.

109.    Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for defendants.

110.    Defendant has acted on grounds generally applicable to all class members in that defendant has engaged in the deceptive business practices described herein, which have

- 47 -

uniformly impacted all class members. Accordingly, injunctive relief is necessary to protect all class members from further injury.

111. Plaintiff knows of no difficulty that would prevent this case from being maintained as a class action. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Class action treatment will, among other things, allow a large number of similarly situated class members to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require. Moreover, class action treatment allows injured consumers the ability to seek redress on claims that might be impracticable to pursue individually.

## V.    CLAIMS FOR RELIEF

### A.    COUNT ONE

### THE FEDERAL DECLARATORY JUDGMENT ACT
### (28 U.S.C. § 2201)

112. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

113. Plaintiffs seek a declaratory judgment that defendant's publishing contracts violate the Maryland Consumer Protection Act ("MCPA").

114. The MCPA prohibits commercial entities from engaging in any "unfair or deceptive trade practice" in "[t]he sale ... of any consumer goods .... or consumer services."[119]

115. The MCPA defines "unfair or deceptive" trade practices to include:

> a. "false ... or misleading oral or written statement[s] ... or other representations ... [that have] the capacity, tendency, or effect of deceiving or misleading consumers."

---

[119] Md. Code Ann., Com. Law § 13-303 (2012).

010313-11 525581 V1

    b.   Representations that "[a] merchant has a sponsorship, approval, status, affiliation, or connection which [it] does not have;

    c.   Representations that "[c]onsumer goods … or consumer services have a sponsorship, approval, … characteristic, … use, [or] benefit, … which they do not have"; and

    d.   "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of any consumer goods … or consumer service … or the subsequent performance of a merchant with respect to an agreement of sale.[120]

116.    Defendant uses a standard contract with all of its authors. On information and belief, defendant has made no material changes to its publishing contracts in the last three years other than the duration of the contract, which does not affect this lawsuit.

117.    Defendant's publishing contract and its representations on its website and other promotional materials falsely claim or convey the false impression that defendant will engage in reasonable marketing efforts and will provide reasonable support to its authors in their efforts to promote their works. Defendant does not disclose to its authors that it will only promote their works on a fee-for-service basis, nor does it reveal to its authors that it lacks the reputation, skills and connections to provide reasonably effective marketing services.

118.    Defendant has a well-documented history of deceiving its authors by false promises of a traditional publishing relationship and by its deceptive services. Defendant's story of deception can be found in many news articles, websites and writers' forums. Plaintiffs are just a few of potentially thousands of authors who have been deceived by defendant's false promises.

---

[120] *Id.* at § 13-301.

119.    Defendant's fee-for-service offers form a part of defendant's deceptive scheme to lure its authors in with false promises of publication by a traditional publisher.  They also independently violate the MCFA because they conceal, suppress, misrepresent or omit material facts that render these services useless.  Defendant lacks the infrastructure, transparency, business model or revenue to operate as a traditional publisher at their level of book output.  It also lacks the reputation to promote books effectively.

120.    Many of defendant's promotions suggest sponsorship, approval, status, affiliation, or connection with other entities that defendant does not have, *e.g.* booksellers, publishers, trade fairs, and the U.S. State Department, in violation of the MCFA.

## B.    COUNT TWO

### MARYLAND CONSUMER PROTECTION ACT
### (MD. COM. LAW § 13-301)

121.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

122.    Defendant's publishing services violate the MCFA's prohibition against deceptive trade practices.

123.    Plaintiffs and the proposed class are consumers, who relied on defendant's representations and have sustained injuries or losses as a result of defendant's deceptive conduct.

124.    Plaintiffs seek the recovery of such damages on behalf of themselves and the class.

010313-11 525581 V1

## C.     COUNT THREE

### UNJUST ENRICHMENT

125.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

126.    Plaintiffs and class members have conferred a benefit upon defendant in the form of rights to publish their works or in the form of payment for one or more of the dubious services defendant offers concerning the publication, production or promotion of their books.

127.    Defendant acknowledges the benefits received.  Defendant seeks to hold the publication rights to the works written by plaintiffs and class members.  Defendant has also retained payments from plaintiffs or class members for services relating to the publication, production or promotion of their books.

128.    Defendant has represented itself as a traditional publisher, rather than a vanity press.  As such, it created expectations that it would provide some minimal services to produce and market the books to the public.

129.    The books are not properly edited and are poorly marketed.  Defendant's no-return policy and pricing policies also make the books unmarketable to the general public.  Because defendant represented itself as a traditional publisher and then failed to provide the minimal services that a traditional publisher would provide, retention of the publication rights to the works of plaintiffs and class members would be inequitable.  For the same reason, it is inequitable for defendant to retain payment for services related to the production and promotion of books published by plaintiffs and members of the class.  It is also inequitable for defendant to retain payment for services that it misrepresented or failed to carry out.

- 51 -

## VI.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the other members of the class, respectfully pray:

A.    That the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action be given to the class;

B.    That the acts alleged herein be adjudged and decreed to be unlawful in violation of Maryland law;

C.    That the Court order defendant to release the publication rights of plaintiffs and all class members who so desire;

D.    That plaintiffs and the class recover damages determined to have been sustained by them, and that judgment be entered against defendant in favor of the class;

E.    That plaintiffs and the class recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorney fees as provided by law;

F.    That defendant be ordered to pay restitution to plaintiffs and the class; and

G.    That plaintiffs and the class be granted such other, further relief as may be determined to be just, equitable and proper by this Court, including but not limited to punitive damages; and that the Court order such other and further relief as the Court deems just, necessary and appropriate.

## VII.    JURY DEMAND

Plaintiffs demand a trial by jury.

010313-11 525581 V1

Respectfully submitted,


John B. Isbister, Federal Bar No. 00639
Daniel S. Katz, Federal Bar No. 01148
Tydings & Rosenberg LLP
100 East Pratt Street, 26th Floor
Baltimore, MD 21202
Telephone: (410) 752-9714
Facsimile: (410) 727-5460

and


Steve W. Berman (pro hac to be filed)
Barbara Mahoney (pro hac to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Ave., Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Attorneys for Plaintiffs*

010313-11 525581 V1