**IN THE UNITED STATES DISTRICT COURT  FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DARLA YOOS, et al. | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
|     v. | )    Case No. 12-cv-1696 |
| | ) |
| PUBLISH AMERICA, LLLP | ) |
| | ) |
|     Defendant | ) |
| | ) |
| _____ | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND TO STRIKE**

Pursuant to Fed. R. Civ. Proc. 12, Defendant Publish America, LLLP ("PA"), moves to dismiss the complaint for failure to state a claim and to strike immaterial allegations therein. The Court should dismiss the claims brought by Plaintiffs under the Maryland Consumer Protection Act ("CPA") because Plaintiffs are not consumers; they have entered into a commercial enterprise with PA pursuant to which they split the proceeds from sales of their literary work made by PA.  This profit sharing relationship is not a relationship that is protected by the ("CPA").  Plaintiffs' declaratory judgment count should also be dismissed since the underlying CPA claim is defective.  Furthermore, Plaintiffs are not entitled to quasi-contract remedies for unjust enrichment because their claims arise from contractual relationships with PA.  For these reasons and others, as more fully explained below, this case should be dismissed.

## I.  PROCEDURAL BACKGROUND

Defendant PublishAmerica, LLLP ("PA") is a book publisher who put its "trust in the big

league of unknown authors." Ex. A.[1]  When it formed in 1999, its founders "had been around in publishing for many years and had seen firsthand, the hardships involved with getting a publisher interested in an unknown author's book."  Id.  They figured that they could "serve as many as a thousand new authors" if they "took full advantage of the latest printing technology. . . ."  Ex. A; see also Ex. B (noting that PA uses "digital printing technology, aka **Print-On-Demand**").  This technology allowed PA to eliminate waste by printing copies of books as they are ordered rather than in large batches (that may ultimately remain unsold) at the time its books are released.  Ex. B.

From this background, PA was founded as a "traditional, royalty paying publisher." Compl. ¶21.  PA defines "traditional publishing" on its website to mean "full availability to all bookstores, through the best distribution channels (Ingram, Baker&Taylor, etc.), top quality books, first rate art design, individual author support and attention, and of course no publishing fees in the contract at any time."  Ex. A.  PA does not include marketing to the public at large as part of its definition of traditional publisher.  Instead, it only mentions that it markets its authors' books "to the industry's wholesale and distribution channels for full availability through all bookstores at home and abroad".  Compl. ¶21.

PA's innovations to the publishing industry have proved to be widely popular. According to its website, it has served almost 50,000 authors since its formation in 1999.  Ex. A. These authors select PA despite being warned that it has "lower acceptance barriers than any

---

[1]Plaintiffs have referenced parts of PA's website in its Complaint.  PA hereby proffers other portions of that website to provide a complete picture of that electronic document. Blankenship v. Manchin, 471 F.3d 523, 525 n.1 (4th Cir. 2006) (allowing defendant to attach documents to its motion to dismiss if those documents are referenced in the Complaint).

other traditional publisher", Ex. C, that its books are not returnable, Ex. D, and that success is far

from certain.  In fact, the contract is explicitly based upon "the mutual understanding that neither

party has guaranteed, or is to guarantee, the sale of any specific number of copies of the Work, it

being impossible to predict, before publication, what success any book may attain."  Compl.,

Exs. 1-3 ¶¶21.  PA also discloses on its website that "[b]ookstores do **not automatically** put a

book on their shelves.  All stores have full access to our books, but in order to actually stock

them, they must believe that the book will sell.  Author:  there is work to be done."  Ex. C

(emphasis in original).

With respect to its authors' obligations under the contract, PA indicates on its website

that the author has one major responsibility: "to provide us with the completed final-version

manuscript."  Compl. ¶22.  Nevertheless, PA admonishes authors that they should not "sit on

[their] hands after signing the contract."  Id.  "We expect the author to actively promote the book

whenever and wherever possible."  Compl. ¶22.

PA went into great detail on its website regarding the promotional activities authors

should consider taking:

> Now, **a word of caution is in order**.  Bookstore availability is not
> necessarily the same as bookstore shelf display.  For a book to be
> stocked by a bookstore, someone high in the hierarchy must decide
> to order it. . . .
>
> This is why it is so important that authors turn themselves into the
> center of all local attention.  Face it, you're no John Grisham or
> Nora Roberts, not yet.  So you must not only beat the drum, but be
> the drum major as well.  All successful marketing begins at home.
>
> Many authors are very creative at this.  There are book signings
> with PublishAmerica authors in bookstores all over the fruited
> plain, every week. . . .  Some authors become very accomplished
> public speakers about their book's topic, or about book writing in

3

> in general.  Others carry flyers and business cards around that they
> hand out anywhere they go.  And then there are some whose
> efforts get a big boost when they discovery that a movie star has
> agreed to a reading of their book as a potential movie script, or that
> their book has actually made it to the big screen.
>
> **Today's author must be active, and he must be innovative.**

Ex. C (emphasis in original).

PA also makes it clear that its own promotional activity is completely optional:

> Sales promotion, advertising and publicity of the work shall be at
> the Publisher's election and discretion as to the extent, scope and
> character thereof and in all matters pertaining thereto. . . .  The
> Publisher may also distribute, at its discretion, for purposes of
> publicity and/or review, promotional information pertaining to said
> literary Work, to publications throughout the United States and/or
> Canada, or elsewhere.

Compl., Exs. 1-3 ¶¶13 (giving PA discretion to create a website for advertising Plaintiff's book).

True to its word, PA issues contracts that contain no author fees.  See generally Compl.,

Exs. 1-3.  Those contracts typically require authors to transfer the publishing rights to their

literary works for 7 years.  Compl. Ex. 1-3 ¶1 (setting contract term at 10 years for Ms. Yoos);

id. ¶22 (setting forth conditions of reversion).  After the contract is signed, the author is required

to submit a final manuscript within 15 days.  Id. ¶¶8 (Ms. Levine's contract allowed her 75 days

to submit her manuscript).  The parties agree that "[a]fter the author's submission of the

Completed Manuscript, no changes and/or corrections shall be made except to correct Publisher

errors".  Id.  The contract also requires PA to pay authors an advance of $1 and royalties on

specified sales of its authors' books.  Id. ¶¶3,8.

Plaintiffs each entered into a contract with PA.  Compl. Exs. 1-3.  Although Plaintiffs

were not required to purchase any services from PA, some of them voluntarily did so.  Compl.

4

¶¶77-111.  They each now claim that PA should have provided them with more services because PA held itself out as a traditional publisher.  E.g. Compl. ¶128.

## II.  LEGAL DISCUSSION

### A.    Legal Standards

"A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is a challenge to the legal sufficiency of a complaint."  Federal Trade Comm'n v. Innovative Marketing, Inc., 654 F. Supp. 2d 378, 384 (D. Md. 2009).  To survive a 12(b)(6) motion, a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. Proc. 8(a)(2).  When reviewing challenges to the adequacy of a Complaint, "courts construe the pleading . . . liberally and accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences from those facts in the plaintiff's favor."  Innovative Marketing, Inc., 654 F. Supp. 2d at 384-85 (complaint should not be dismissed unless it "appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief").  In order to be well pled, a complaint must set forth sufficient facts to state a claim that is "plausible on its face"; detailed factual allegations are unnecessary but "formulaic recitation of the elements of a cause of action" are insufficient.  Id. at 385.  When determining whether an inference is reasonable, courts are not allowed to institute a "probability requirement"; neither should they accept farfetched "possibilities".  Id.  Rather courts must draw upon judicial experience and common sense when determining what inferences are reasonable based upon the context of the case.  Id.

### B.    Plaintiffs Have Failed To Allege A Claim Under the Consumer Protection Act

The Court should dismiss Plaintiff's claim for damages under the Consumer Protection

Act ("CPA").  Compl., Count II.  "[T]he Maryland General assembly enacted the CPA "to

provide protection against deceptive practices in <u>consumer</u> transactions."  <u>Citaramanis v.

Hallowell</u>, 328 Md. 142, 150, 613 A.2d 964, 968 (1992) (emphasis added).  In addition to public

enforcement through the Division of Consumer Protection of the Office of the Attorney General,

"the Legislature has provided for a private action for damages by a consumer who has been

subjected to a practice prohibited by the CPA."  <u>Id.</u>, at 150-51, 613 A.2d at 968; <u>see also</u> Md.

Ann. Code, Comm. Law § 13-408.

> **1.     Plaintiffs' Cannot Bring a Claim Under the CPA Because They Are Not Consumers**

Plaintiffs' claims are not within the scope of the CPA.  "The Act prohibits certain unfair

and deceptive trade practices 'in the sale . . .of any consumer goods or services. . . . '"  <u>Morris v.

Osmose Wood Preserving</u>, 340 Md. 519, 536, 667 A.2d 624, 633 (1995) (citing Md. Code Ann.,

Comm. Law § 13-303); Md. Code Ann., Comm. Law § 13-101(I).  "Consumer goods [and

services] are defined by the Act as goods [and services] 'which are primarily for personal,

household, family, or agricultural purposes."  Md. Ann. Code, Comm. Law § 13-101(d).

A sale is covered by the CPA only if the purchaser in that specific transaction intends to

use the goods or services for personal or household reasons.  <u>Morris</u>, 340 Md. at 539, 667 A.2d

at 634

> The only reasonable definition of consumer goods is goods sold or
> offered for sale <u>to persons</u> who [themselves] intend to use them
> primarily for personal, family, household, or agricultural
> purposes."  A sale of consumer goods under the CPA is, therefor, a
> sale in which the <u>buyer</u> intends to use the goods primarily for these
> purposes.  Consequently, the deceptive trade practice must occur
> in the sale or offer for sale <u>to the consumer</u>.

<u>Id.</u>, at 540-41, 667 A.2d at 635 (emphasis added).  In other words, it is insufficient that the goods

or services are "eventually intended to be for personal, household or family purposes."  If the buyer himself does not intend to use a good or service for personal or household uses, but only intends to resell it to a consumer (or incorporate the good into another product which will later be resold to consumers), the CPA is not implicated.

The Court of Appeals' decision in <u>Morris</u> is instructive. There:

> the allegedly deceptive practices occurred entirely during the marketing of the plywood to the builders.  Essentially, the [plywood manufacturers] represented in advertising targeted to builders that their products were suitable for roofing, and [homeowners] claim this representation is untrue.  There is no allegation that the manufacturers were in any way involved in selling . . . the townhouses that the plaintiffs bought.  Nor is there any allegation that defendants attempted to influence the homeowners to purchase townhomes containing their brand of plywood.  The only effect the alleged misrepresentation had on the sale of the townhouses was the creation of a possibly erroneous belief on the part of the builders which caused them to include allegedly inferior products in the townhouse.  This remote effect on the sale of consumer realty is not sufficient for us to conclude that the deceptive trade practice actually occurred in that sale.

<u>Id.</u>, at 541-42, 667 A.2d at 636.

Here, Plaintiffs cannot establish that they purchased consumer goods and services.  Rather, they entered into a complex commercial arrangement with PA.  On the one hand they transferred an intangible property interest to PA; they authorized PA to manufacture and publish internationally the books that they authored.  Compl., Ex. 1-3 ¶¶1.  In exchange, PA agreed to share the proceeds that it earned from sales of Plaintiffs' books by paying royalties to Plaintiffs on specified sales.  <u>Id.</u> ¶¶3.  In fact, Plaintiffs admitted in their Complaint that they entered into their publishing contracts with PA for the purpose of earning income and promoting their works to the public at large and not for personal or household use.  <u>See</u> Compl. ¶80 (Ms. Yoos

admitting that she entered into publishing contract to "compete with other books by first-time or little known authors"); <u>id.</u> ¶93 (Mr. McCall alleging that purpose of contract was to "promote his book" to the general public); <u>id.</u> ¶117 (Plaintiffs admitting that they primarily object to PA's efforts to market and promote their works to the public);  <u>id.</u> ¶128 (plaintiffs complaining because PA's policies "make the books unmarketable to the general public").  Thus, they are not consumers within the scope of the CPA as a matter of law.

This conclusion is not contradicted by the fact that PA produces a product that is ultimately purchased by consumers, <u>i.e.</u> books.  Plaintiffs are not the buyers in the transactions where PA sells books to customers for household use.  Rather, they are more akin to a materialman, who supplies PA with one of the components (book content) integrated into the finished product (along with paper, ink and adhesive) sold by PA.  Nor are Plaintiffs complaining about deceptive practices directed at customers who purchase PA's books for the home.  Rather, they complain about the commercial marketing activities that they expected PA to perform on their behalf, <u>i.e.</u> marketing their books to the public.  <u>See</u> Compl. ¶13 (alleging that PA "convey[s] the false impression that [it] will engage in reasonable marketing efforts and will provide reasonable support to its authors in their efforts to promote their works").  In other words, Plaintiffs complain because they expected PA to do more work to make their books profitable.  This is not a consumer expectation; it is a commercial one.

### 2.  <u>Plaintiffs Failed To Identify Any Deception</u>

Plaintiffs have failed to identify any conduct that violates the CPA.  A representation is deceptive under the CPA if it is false and has the capacity to mislead consumers.  Md. Ann. Code, Comm. Law § 13-301(1); <u>see also id.</u> §§ 13-301(2).  A failure to disclose material facts is

deceptive if the seller omitted or concealed the fact "with the intent that a consumer rely on the same in connection with the promotion or sale of any consumer goods."  Id. § 13-301(9).  A representation is material if it is "likely to affect [a consumer's] choice of a product".  Luskins, Inc. v. Consumer Protection Division, 353 Md. 335, 726 A.2d 702 (1999).

A statement can only be deceptive if it is likely to mislead consumers acting reasonably under the circumstances.  Luskins, Inc., 353 Md at 347, 354, 726 A.2d at 708, 711.  Indefinite generalities, "puffing", and "sales talk" are not actionable under the CPA.  McGraw v. Loyola Ford, Inc., 124 Md. App. 560, 582, 723 A.2d 502, 512-13 (1999).   "As we see it, this is the sort of speech that is 'offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable person would rely."  Id., 124 Md. App. at 582-84, 723 A.2d at 512-13 ("the use of the term 'perfectly safe' . . . was so extravagant . . . indefinite and elusive . . . that [it] would fall within the category of a puff").  "There can be no recovery for deceit, for example for a statement that the plaintiff is being offered an exceptionally good bargain, that he would be foolish not to take advantage of the offer."  Id., at 582, 723 A.2d at 513.

Furthermore, "a private party suing under the CPA must establish actual injury or loss."  Lloyd v. GM Corp., 397 Md. 108, 142-43, 916 A.2d 257, 277 (2007); Citarmanis, 328 Md. at 151-52, 61 A.2d at 968.  "The injury must be objectively identifiable.  In other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation."  Lloyd, 397 Md. at 143, 148, 916 A.2d at 277, 281.  This limitation was put in place out of "fear" that "the powerful weapon given consumers in the form of the private remedy 'was capable of being used

improperly for harassment and improper coercive tactics".   <u>Citarmanis</u>, 328 Md. at 152, 61

A.2d at 968; <u>Lloyd.</u>, 397 Md. at 143, 148, 916 A.2d at 277, 281. The "private remedy is purely

compensatory; it contains no punitive component." <u>Golt v. Phillips</u>, 308 Md. 1, 12, 517 A.2d

328, 333 (1986).

**a.      Edwin McCall Has Failed To Allege That He Was Deceived**

Mr. McCall has failed to state a claim for relief against PA under the CPA.  Nowhere in

the Complaint does he allege that he suffered any damages or injury.  Compl. ¶¶87-95 (admitting

that he paid no money to PA whatsoever).  Since he is not entitled to any restitution, he has

failed to plead a necessary element to his case.  <u>Lloyd v. GM Corp.</u>, 397 Md. 108, 142-43, 916

A.2d 257, 277 (2007).  Nor can he correct that defect by asking for rescission, Compl. ¶95, or

punitive damages, <u>id.</u>, <u>ad damnum</u> clause, since those remedies are not available under the CPA.

<u>Compare</u> Md. Ann. Code, Comm. Law § 13-408; <u>Golt</u>, 308 Md. at 12, 517 A.2d at 333.

Even if rescission was available under the CPA, Mr. McCall is still not entitled to it

because he has failed to allege that he reasonably relied upon any misrepresentations.  <u>Lloyd</u>,

397 Md. at 143, 148, 916 A.2d at 277, 281.  Although he complains about typographical errors in

his book, Compl. ¶¶88-89, he does <u>not</u> allege that PA ever led him to believe that it would fix his

mistakes before publication.  This is not surprising since the parties agreed that PA had no

obligation to edit Mr. McCall's book.  According to the contract, the manuscript submitted by

Mr. McCall was <u>final</u>–<u>no</u> changes would be made to it after it was submitted.  Compl., Ex. 2 ¶8

("Author agrees to deliver to Publisher the <u>final</u> version of the manuscript . . . within 15 days of

the Effective Date" and that upon his "submission of the Completed Manuscript, no changes

and/or corrections shall be made except to correct Publisher errors").  Thus, Mr. McCall knew

10

when he submitted his manuscript that he (not PA) was obligated to ensure it was error free.  See

Call Carl, Inc. v. BP Oil Corp., 554 F.2d 623, 632 (4th Cir. 1977) (rejecting plaintiff's fraud

claim "in the face of plainly contradictory contractual language"); McGraw, 124 Md App. at

580, 723 A.2d at 511-12 (holding that plaintiff could not establish reliance on false statement

that was inconsistent with subsequent documents containing accurate statements).

Mr. McCall also claims that PA breached its obligation to take "reasonable steps" to

promote his book.  Compl. ¶41.  According to him, he expected PA to take unspecified steps to

promote his book because it called itself a "traditional publisher".  Id. ¶¶41, 87, 92 (alleging his

"underst[anding] that it was the publisher's job to present the book to the media").  Again, his

expectations were directly contradicted by the contract.  According to that contract, PA's

obligation to promote Mr. McCall's book was nonmandatory: "Sales promotion, advertising and

publicity of the Work shall be at the Publisher's election and discretion as to the extent, scope

and character thereof and in all matters pertaining thereto."  Compl., Ex. 2 thereto ¶13 (emphasis

added).  Thus, PA had wide latitude when deciding how, when or even if to market Mr. McCall's

book.[2]  Mr. McCall's alleged expectations were also contradicted by PA's website.  Nowhere on

that site did PA promise to market his book other than to the "industry's wholesale and

distribution channels for full availability through all bookstores".  Compl. ¶21; see also Ex. C.

That is not to say that PA had absolute freedom to exercise its discretion under paragraph

13.  Pursuant to the implied covenant of good faith and fair dealing, PA was precluded from

---

[2]Mr. McCall also claims that PA breached a promise to "provide him a "website type page'" for the promotion of his book.  Compl. ¶93.  This expectation was also explicitly contradicted by the contract.  Compl., Ex. 2 ¶13 (granting PA the option to "create . . . a separate domain on the Internet, exclusively dedicated to promoting the said literary Work" at "the Publisher's sole expense and discretion").

"acting in such a manner as to prevent [Mr. McCall] from performing his [own] obligations under the contract. Eastern Shore Markets, Inc. v. J.D. Assocs LP, 213 F.3d 175, 182-83, 184 (4th Cir. 2000) (noting that parties were precluded from "frustrating" other party's performance)). For example, if PA decided to exercise its discretion and promote Mr. McCall's book, it could not spitefully disparage him with the intent to hurt sales. Id. at 183 (noting implied duty "to refrain from destructive competition"). However, nothing in the implied covenant of good faith or fair dealing obligated PA "to take affirmative actions that [it was] clearly not required to take under the contract." Id., at 182 (implied duty of good faith "is not understood to interpose new obligations about which the contract is silent"). Since Mr. McCall's contract does not specify any particular promotional services that PA is obligated to take, the implied covenant of good faith and fair dealing cannot be used to interpose any such obligations on PA.

In fact, Mr. McCall admits that his current expectations about promotion evolved after the contract was formed. According to him, he originally believed that it was his obligation to help PA promote his book. Compl. ¶90 (admitting that he promoted his own book because it "fulfilled his end of the contract"). Indeed, PA encourages authors on its website to promote their own books. Compl. ¶21 ("We expect the author to actively promote the book whenever and wherever possible"); see also Ex. C. In furtherance of his understanding, Mr. McCall expended considerable efforts promoting his book, sending hundreds of e-mails to family and friends, as well as newspapers, magazines, radio and TV stations. Compl. ¶¶90, 92. Although he later questioned the value of his own marketing efforts, id. ("Mr. McCall found the process counterproductive"), these second thoughts are based upon his evaluation of PA's performance rather than his reliance on any representation made by PA before the contract was formed.

12

Accordingly, they cannot support a CPA claim.[3]   Lloyd., 397 Md. at 143, 148, 916 A.2d at 277,

281 (requiring CPA plaintiff to prove that he relied upon misrepresentation).   By failing to

identify any promotional services that PA was obligated to provide, Mr. McCall failed to meet

his pleading requirements under the CPA.  Fed. R. Civ. Proc. 9(b) (circumstances constituting

fraud must be stated with particularity).

### b.      Darla Yoos Has Failed To Allege That She Was Deceived

Ms. Yoos has failed to establish that she is entitled to restitution of the promotional

services that she allegedly purchased from PA.  Compl. ¶77.  According to her, PA led her to

believe that it would not offer her promotional services for a fee because it represented that it

was a traditional publisher.  Based upon this interpretation of the term "traditional publisher",

she claims that she was induced to enter into the publishing contract.  As with Mr. McCall, the

contract and the website dispel any reasonable implication that PA would provide any specific

promotional services.  See supra part II.B.2.a.  Even if they did not dispel that implication as a

matter of law, Ms. Yoos' conduct is fatally inconsistent with such a claim..  Assuming she truly

believed at the time the contract was formed that PA was barred from offering her promotional

services for a fee, she waived her objection by voluntarily purchasing 10 different marketing

services after the contract was formed.  Compl. ¶77.  To proceed with those purchases in the face

of such knowledge amounts to a voluntary relinquishment of a known right and rebuts any

---

[3]For the same reason, Mr. McCall's complaint, that PA "listed" his book in the wrong
category on its website, Compl. ¶90, and required him to pay a fee in order to terminate the
contract, id. ¶95, also fail to support a CPA claim.  These claims are not based upon Mr.
McCall's reliance upon any misrepresentation made by PA.  With respect to placing the Book in
the wrong category, that is based upon his observations of PA's performance rather than reliance
on any misrepresentation.  As for termination, Mr. McCall had no right to demand termination.
See generally Compl. Ex. 2.  Accordingly, he should have expected that PA might require him to
pay a fee in order to rescind the contract by mutual assent.

inference that she reasonably relied on her post hoc interpretation of the phrase "traditional publisher".[4]  Progressive Casualty Ins. v. Ehrhardt, 69 Md. App. 431, 443, 518 A.2d 151, 157 (1985).

On the other hand, if she was not "aware" of PA's obligation to perform promotional services for free at the time that she purchased them from PA, then she cannot establish a violation of the CPA.  In order to state a claim under the CPA, she has to establish that PA led her to believe such services were included in the contract at the time the contract was formed. If she was not aware of PA's obligation to perform such services for free when she purchased those services (after the contract was formed), then she could not have relied upon such representations when entering into the contract.  Lloyd., 397 Md. at 143, 148, 916 A.2d at 277, 281 (requiring CPA plaintiff to prove that he relied upon misrepresentation).  In fact, what Ms. Yoos really seems upset about is not that PA asked her to pay for these services, but the quality of PA's performance.  Compl. ¶79 (complaining that she was dissatisfied with the amount of work PA did for her payment–not that PA never should have offered her these services in the first place).

Ms. Yoos has also failed to allege that she was harmed by PA's offer to lower the price of her book.  Compl. ¶80.  Since she never paid PA to lower the price, she suffered no damage. Accordingly, she failed to allege a necessary element to her claim.  Lloyd, 397 Md. at 142-43, 916 A.2d at 277.

### c.   Kerri Levine Has Failed To Allege That She Was Deceived

As with Ms. Yoos, Kerri Levine has also failed to establish that she is entitled to

---

[4]For the same reason, she cannot recover the fee that she paid to terminate the contract. Compl. ¶85.  By voluntarily paying that fee she waived any right to subsequently recover it.

restitution for the services that she purchased.  If she honestly believed that PA was prohibited

from offering these services to her, then she waived any breach of contract claim by voluntarily

purchasing them; on the other hand, if she did not believe that PA was prohibited from offering

those services until some point after the contract was formed, then PA's use of the term

"traditional" publisher did not deceive her into entering that contract as a matter of law.

### d.      Plaintiffs Cannot Save Their Claims By Smearing PA

Plaintiffs try to cure the defects in their claims by citing to disparaging statements about

PA that were made by third parties.  Compl. ¶¶23-35.  These statements, however, are

completely immaterial.  Many were made well outside the time frame alleged in this Complaint.

Compare Compl. ¶¶23, 29, 30 (identifying derogatory newspaper articles from 2004 to 2006)

with Compl. ¶104 (seeking restitution for all people who have "purchased [PA's] promotion[al]

services within the last three years").  Some are directly contradicted by PA's website.[5]

Compare Compl. ¶¶23, 26-27 (complaining that (a) PA does little copy editing; (b) does not

make its books returnable; (c) uses print on demand technology; (d) has "relatively few of their

11,000 titles" stocked on "store shelves"; and (e) fails to distribute review copies) with Compl.,

Exs. 1-3 ¶¶8, 13 (making editing and distribution of review copies optional), Ex. A (disclosing

its use of print-on-demand technology, Ex. C (warning authors that PA's books are not

necessarily stocked on shelves), and Ex. D (noting that its books are "non-returnable").  Some

have absolutely nothing to do with the objections raised by Plaintiffs.  Compl. ¶30 (third parties

accusing PA of selling books to which it has no rights).  Other are just hopelessly confusing or

---

[5]Ann Crispin's complaints are contradicted by PA's contract.  Compl. ¶24 (claiming PA's reversion clause and advance are unreasonable) with Compl. Exs. 1-3 ¶¶8, 22 (fully disclosing amount of author's advance ($1) and right to reversion).

hypothetical.  Compl. ¶31 (quoting author as saying: "If they would just say, buy your books up front and pay X amount and we'll give you X, Y, and Z, then that would be one thing" . . . but they don't).  These articles are simply incapable of supporting Plaintiffs' claims as a matter of law.

In fact they are so scandalous that they should be stricken from the Complaint so as not to prejudice the fact finder and unnecessarily confuse the issues in the case.  Fed. R. Civ. Proc. 12(f).  Although motions to strike are "disfavored", the Courts are "granted considerable discretion . . . especially if the allegations in the complaint will cause prejudice at a later date in the litigation."  Schultz v. Braga, 290 F. Supp. 2d 637, 654 (D. Md. 2003); Xerox Corp. v. Imatek, Inc., 220 F.R.D. 244 at * 245 (D. Md. 2004) (noting that allegations must be both immaterial and prejudicial).  "Furthermore, the disfavored character of Rule 12(f) is relaxed in the context of scandalous allegations, i.e. those that improperly cast a derogatory light on some one."  Mike's Train House, Inc. v. Broadway Limited Imports, LLC, 2011 WL 2415014 at * 2 (D. Md. 2011).  Similarly, the Court should strike the promotional offers criticized by Plaintiffs in the Complaint but which they did not purchase.  Compl. ¶¶40-41, 47-53, 56-71.  They add nothing to Plaintiffs' claims.

**C.**     **The Court Should Dismiss Plaintiffs' Declaratory Judgment Action (Count I)**

The Court should dismiss Plaintiffs' declaratory judgment claim (Count I) for the same reasons that the CPA claim is defective.  "The Declaratory Judgment Act [("DJA")] is designed to afford parties, threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy."  Collin County, Tx. v. Homeowners Association for Values Essential to Neigborhoods, 915 F.2d 167, 170, 172 (5th Cir. 1990); Stamicarbon, N.V. v.

Chemical Constr. Corp., 355 F. Supp. 228, 232-33 (D. Del. 1973) ("a declaratory judgment

action . . . permits a party to determine his rights immediately instead of waiting to be sued").

"What is litigated in such a situation is 'the precise issue which could have been litigated in

federal court" had the declaratory defendant filed a coercive action rather than just threaten one.

Lowe v. Ingalls Shipbuilding, 723 F.2d 1173, 1179, 1180 (5th Cir. 1173).  "In other words, the

declaratory judgment procedure is an alterative to pursuit of . . . arguably illegal activity."

Hipage Co. v. Access2Go, Inc. 589 F. Supp. 2d 602, 614, 615 (E.D. Va. 2008); see also Benitec

Australia, LTD v. Nucleonics, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007).

     Since declaratory relief is "designed to declare rights so that parties can conform their

conduct to avoid future litigation", it "is unavailable in situations where claims and rights

asserted have fully matured, and the alleged wrongs have already been suffered."  Gallant v.

Deutsche Bank Nat'l Trust, 766 F. Supp. 2d 714, 719 (W.D. Va. 2011); Tapia v. U.S. Bank,

N.A., 718 F. Supp. 2d 689, 695 (E.D. Va. 2010); Hipage Co., 589 F. Supp. 2d at 615.  When a

claim has already accrued, the injured party should seek traditional forms of relief as an

alternative to a declaratory judgment.  Johnson v. D&D Home Loans Corp, 2007 WL 4355278 at

*4 (E.D. Va. 2007) ("the remedy ought to be refused if another remedy would be more

appropriate or effective").

     When it comes to declaratory relief, it is important to emphasize that it is only

procedural.  "Congress enlarged the range of remedies available in the federal courts but did not

extend their jurisdiction."  Lowe, 723 F.2d at 1179; see also Skelly Oil Co. v. Phillips Petroleum

Co., 339 U.S. 667, 671-72 (1950); Plimpton v. Cooper, 141 F. Supp. 2d 573, 576 (W.D.N.C.

2001).  Thus, the Declaratory Judgment Act "does not create an independent cause of action, it

only provides a form of relief previously unavailable." <u>E.g.</u>, <u>Alvidrez v. Ridge</u>, 311 F. Supp. 2d 1163, 1165 (D. Kan. 2004); <u>see also</u> <u>Davis v. United States</u>, 499 F.3d 590, 594 (6th Cir. 2007); <u>Mead Corporation v. United States</u>, 490 F. Supp. 405, 407 (D.D.C. 1980); <u>Laws v. Priority Trustee Services of N.C., LLC</u>, 610 F. Supp. 2d 528, 532 (W.D.N.C. 2010).  In order to acquire jurisdiction under the declaratory judgment act, then, there must be "an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring, if not for the fact that the declaratory plaintiff has preempted it" by bringing his own action.  <u>E.g.</u> <u>Benitec Australia, LTD</u>, 495 F.3d at 1344; <u>Chevron Corp. v. Naranjo</u>, 667 F.3d 232, 244 (2d Cir. 2012).  Thus, a declaratory judgment action is "barred to the same extent that the claim for substantive relief on which it is based would be barred."  <u>International Ass'n of Machinists & Aerospace Workers v. Tennessee Valley Auth.</u>, 108 F. 3d 658, 667-68 (6th Cir. 1997).

1.     **Plaintiffs Cannot Save their Defective Consumer Protect Act Claim by Bootstrapping It To A Claim for Declaratory Judgment**

The Court should dismiss Plaintiffs' request for declaratory relief because their underlying substantive claim is fatally defective.  Plaintiffs' declaratory judgment action is based exclusively on alleged violations of the Consumer Protection Act.  Specifically, Plaintiffs seek "a declaratory judgment that defendant's publishing contracts violate the Maryland Consumer Protection Act".  Compl. ¶113.  Since Plaintiffs cannot, as a matter of law, prosecute a coercive claim for relief under the CPA, <u>see supra</u> Part II.B, neither can they seek declaratory relief under that statute.  <u>Chevron Corp.</u>, 667 F.3d at, 244; <u>International Ass'n of Machinists & Aerospace Workers</u>, 108 F. 3d at 667-68.   The Declaratory Judgment Act simply does not provide them with an independent cause of action.  <u>Davis</u>, 499 F.3d at 594.

**2.      It Would Be Inappropriate for the Court to Declare Rights That Are Fully Matured When Alternative Remedies Are Available**

Even if there were an independent basis to exercise jurisdiction over Plaintiffs' declaratory judgment action, the claim would still be defective because the underlying purpose of the DJA is not served.  Plaintiffs are not seeking to test claims threatened by PA.  Lowe, 723 F.2d at 1179, 1180.  Nor are they seeking to clarify whether their own conduct is legal.  Hipage Co., 589 F. Supp. 2d at 614, 615.  Instead, they have articulated claims for damages against PA and asked for rescission of their contracts.  In other words, they are simply prosecuting their own coercive, fully matured claims for deception under the CPA.  This is an inappropriate ground for declaratory relief.  Tapia, 718 F. Supp. 2d at 695. In fact, declaratory relief is completely unnecessary.  Plaintiffs could "more effective[ly] resolve all of the issues identified in their declaratory judgment count using traditional remedies like a damage action.  Eaton Vance Mgt. v. Forstmannleff Assocs, LLC, 2006 WL 2331009 2331009 at *3 (S.D.N.Y. 2006); see also Johnson, 2007 WL 4355278 at *4.

**3.      Plaintiffs Should Not Be Permitted to Use the Declaratory Judgment Act as a Device To Avoid Analysis Under The Class Action Predominance Test**

Plaintiffs have certainly manufactured a declaratory judgment claim in order to obtain a procedural advantage when they seek class certification.  According to class action Rule 23(b), Plaintiffs must show that issues common to the class predominate over individual issues when money damages is the primary relief requested; that requirement is relaxed where the relief sought is predominately declaratory.  Compare Fed. R. Civ. Proc. 23(b)(2) with id. 23(b)(3); Thorn v. Jefferson-Pilot Life Ins., 445 F.3d 311, 329-30 (4th Cir. 2006).

Here, Plaintiffs cannot establish that issues common to the class predominate over

individual issues.  On the one hand, there are some similarities between Plaintiffs' claims.

Generally speaking, Plaintiffs allege that PA was precluded from charging certain fees to them

because PA held itself out as a "traditional publisher".  <u>Compare</u> Compl. ¶16 (alleging that

traditional publishers do not "take money from the author").  However, any similarities between

these claims are far outweighed by the differences.

 For example, Both Ms. Yoos and Ms. Levine complain about PA's offer to reduce the

price of their respective books for a fee but Mr. McCall does not.  <u>Compare</u> Compl. ¶80 <u>with</u>

Compl. ¶¶87-95, <u>and</u> Compl. ¶98.  Furthermore, Ms. Levine and Ms. Yoos relied on PA's offer

to reduce the prices of their respective books differently.  Ms. Yoos objected to paying any fee

and Ms. Levine voluntarily paid it.  <u>See supra</u> Parts II.B.2.b & II.B.2.c.  The factual differences

between these two claims is further evidenced by the communication history between PA and

these two authors, which are significantly different.  <u>Compare</u> Compl. ¶¶80-84 <u>with</u> id. ¶¶98, 99-

101.  Other aspects of their claims are also factually and legally distinguishable.  <u>Compare.</u>

Compl.¶¶ (Ms. Yoos complaining about promotional packages that she purchased but not

editing), <u>and</u> id. ¶¶87-94 (Mr. McCall complaining that PA did not sufficiently edit or promote

his book but admitting that he purchased no promotional or editing packages from PA), <u>with</u> id.

¶¶ (Ms. Levine complaining about editing and promotional packages that she purchased).

 Since questions of law or fact common to the class do not predominate over Plaintiffs'

individualized claims, they have a strong motive to manufacture a declaratory judgment claim.

That way, they can preserve jurisdiction over this case under the less demanding rules set forth

in Rule 23(b)(2).  However, this type of procedural fencing is not acceptable.  <u>Eaton Vance Mgt.</u>,

2006 WL 2331009 at *3.  This conclusion is bolstered by the fact that Plaintiffs would not bother

to bring their claims "even in the absence of a possible monetary recovery".  Edwards v. Publishers Circulation Fulfillment, 268 F.R.D. 181, 189 (S.D.N.Y. 2010).  If the purpose of a suit is to recover money rather than change conduct, then the existence of declaratory relief in the complaint is not sufficient to support class certification.  Edwards, 268 F.R.D. at 189.  Here, declaratory relief by itself would provide Plaintiffs no incentive to prosecute their claims. The conduct to which they object, i.e. PA's representation that it was a traditional publisher, has already caused them all of the harm that they could conceivably incur.  Thus, if the Court ordered PA to stop using the phrase "traditional publisher", Plaintiffs would not benefit at all unless it was coupled with another form of relief, e.g. restitution or rescission.  The only people who could conceivably benefit from that relief would be authors who are currently looking for a new publisher.  Since that class is not before the Court, any declaratory judgment regarding PA's use of the phrase traditional publisher would be in the nature of an inappropriate advisory opinion.[6]

**D.    Plaintiffs' Claim for Unjust Enrichment Is Defective**

Plaintiffs have failed to state a claim for unjust enrichment.  Compl., Count III.  Unjust enrichment and quantum meruit, both 'quasi-contract' causes of action, are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided."  Dunnaville v. McCormick & Co., , 21 F. Supp. 2d 527, 535 (D. Md. 1998)) (noting that quasi-contract claims include "quantum meruit and unjust enrichment").  In order to establish the right to recovery for unjust enrichment, Plaintiffs must show that they (i) conferred a benefit upon the defendant; (ii) the defendant was

---

[6]In any event, class certification is an exercise in futility because reliance is an issue raised by Plaintiffs' CPA claim.  E.g. Broussard, 155 F.3d at 342.

21

aware of or appreciated the benefit; and (iii) the acceptance or retention by the defendant of the benefit under the circumstances makes it inequitable for the defendant to retain the benefit without payment for its value."   Dunnaville, 21 F. Supp. 2d at 535.  A "claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."  FLF, Inc. v. World Publications, Inc., 999 F. Supp. 640, 642 (D. Md. 1998).

Here, Plaintiffs' unjust enrichment claims are defective because the subject matter is covered by the publishing contracts between the parties.  For example, the benefits that Plaintiffs want returned include the literary rights that were explicitly transferred to PA in the contract. Compare Compl. ¶129 with Compl., Exs. 1, 2, 3 (Darla Yoos, Edwin McCall and Kerri Levine granting PA the rights respectively to Diary of a Demonologist, Dirty Potaotes and From Catholic to Atheist by contract).  In other words, Plaintiffs are essentially asking the Court to rescind the contracts and return the parties to the position they were in prior to the formation of their respective contracts.  Ellerin v. Fairfax Savings Ass'n, 78 Md. App. 92, 109, 552 A.2d 918, 926 (1989) (rescission "is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud or duress") (emphasis added).  Plaintiffs cannot obtain relief from their  contracts using a quasi-contract cause of action.  FLF, Inc., 999 F. Supp. at 642.

Furthermore, the inequitable conduct identified by Plaintiffs is also covered by the subject matter of the contracts.  According to Plaintiffs, PA "created expectations" that it would provide a certain level of service when it held itself out as a "traditional publisher" but "then failed to provide" those services.  Compl. ¶¶128-29 ("PA failed to provide the minimal services that a traditional publisher would provide").  The resolution of this issue is, of course, controlled

by the parties' contracts because that document best defines the parties' expectations.  Compl.,

Exs. 1-3 (describing conditions upon which Plaintiffs would transfer publishing rights and PA

would publish work).  Since the Court cannot resolve Plaintiffs' claims without fully immersing

itself in an interpretation of the parties' contracts, it would be inappropriate to proceed under a

quasi-contract action.

### III.  CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice and the

allegations in paragraphs 23-35, 40-41, 47-53, and 56-71 should be stricken.

Respectfully Submitted,


_____/s/_____
Victor E. Cretella III
230 E. Patrick St.
Frederick, MD  21701
301-228-2705
vec@publishamerica.com
Bar No. 13459
Counsel for PublishAmerica

### CERTIFICATE OF SERVICE

I hereby certify that pursuant to Fed. R. Civ. Proc. 5(a) and LR 103(1)(C), a true and correct
copy of the foregoing Motion, and all supporting papers, was served electronically pursuant to the
Court's CM/ECF systems to counsel for Plaintiffs, including: John B. Isbister, Daniel S. Katz,
Tydings & Rosenberg LLP, 100 East Pratt Street, 26th Floor, Baltimore, MD 21202, on March 30,
2012.

_/s/_____

Victor Cretella